Khabir Ramzi HADI, and those similarly situated, Plaintiffs-Appellants,

v.

Robert W. HORN, John Wright, and Errol Grant, Defendants-Appellees.

No. 86–1098.

United States Court of Appeals, Seventh Circuit.

Argued May 28, 1987.

Decided Oct. 2, 1987.

David S. Fleming, Karon, Morrison & Savikas, Ltd., Chicago, Ill., for plaintiffs-appellants.

William Frazier, Asst. Atty. Gen., Chicago, Ill., for defendants-appellees.

Before CUMMINGS, CUDAHY and COFFEY, Circuit Judges.

CUDAHY, Circuit Judge.

The appellants in this case are inmates in a state prison who adhere to the Islamic faith. They sued three state prison administrators for allegedly interfering with their First Amendment right to exercise their religious beliefs. After a bench trial, the district court found for the defendants. The prisoners appeal that decision. We affirm.

I.

This class action was brought on behalf of all present and future inmates at the Pontiac Correctional Center ("Pontiac") who adhere to the Muslim or Al-Islam faith. Pontiac is a maximum security prison operated by the Illinois Department of Corrections (the "IDC"). The defendants were two administrators at Pontiac and one official of the IDC.[1] The plaintiffs brought suit under section 1983, 42 U.S.C. § 1983,[2] claiming that the defendants interfered with their First Amendment right to free exercise of their religious beliefs by, *inter alia:* (1) cancelling their prayer service, Jumah, because of scheduling conflicts;[3] (2) cancelling services when a Muslim chaplain was unable to be present rather than allowing an inmate to conduct services under the supervision of a non-Muslim chaplain; and (3) impeding the ability of inmates who wished to attend Jumah to secure release from work. The plaintiffs sought a declaratory judgment that these practices violated their First Amendment rights, damages and a permanent injunction.

1. Defendant Robert W. Horn was the Administrative Chaplain for the IDC between 1974 and 1981. Defendant Errol Grant was Senior Chaplain at Pontiac between August 1976 and October 1980. Defendant John Wright was the Assistant Warden of Programs at Pontiac between November 1979 and July 1982.

2. Section 1983 provides, in relevant part:
   Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the dep-

rivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
42 U.S.C. § 1983 (1982).

3. Under the Islamic faith, Jumah must be held every Friday after the sun reaches its zenith. The Jumah service consists of two parts: a prayer, followed by a sermon relating the subject of the prayer to current community problems. The service is conducted by an Imam; in the Islamic faith, an Imam is a spiritual leader.

■ The district court held for the defendants after a bench trial. *Hadi v. Horn,* No. 80–2207, Findings of Fact & Conclusions of Law (C.D.Ill. Nov. 27, 1985) ("Order").[4] The court treated this case as a suit against the defendants solely in their official capacities. To establish a claim in an official capacity suit, a plaintiff must show that the actions on which liability is predicated took place pursuant to a government policy or custom. *See Kentucky v. Graham,* 473 U.S. 159, 166, 105 S.Ct. 3099, 3106, 87 L.Ed.2d 114 (1985). With respect to the cancellation of services due to scheduling conflicts with other prison activities, the court stated that no important state objective was promoted by giving priority to these other activities—such as movies or concerts—rather than to the prayer service. The court, however, found that there were at most a half-dozen such cancellations over a five-year period and thus cancellations were too infrequent to amount to a state policy. Order at 4–5, 7–8. The court also found that the plaintiffs did not introduce sufficient evidence to show a state policy prohibiting Muslim inmates from leaving their work assignments to attend services. *Id.* at 5. Finally, the court found that the cancellation of services when a chaplain was unavailable to conduct them occurred only occasionally and represented a reasonable security measure. *Id.* at 5–6, 7.

On appeal, the plaintiffs argue that the district court erred in framing its analysis in terms of the defendants being sued in their official capacities. The plaintiffs instead claim that the defendants were sued in their individual capacities and that the district court therefore was mistaken insofar as it based its decision on the absence of a state policy. The plaintiffs also have dropped their claim based on the alleged difficulties that Muslim prisoners have had in securing release from work to attend Jumah and instead focus on the cancellation of services.[5]

## II.

■ The first issue we must address is the capacity in which the defendants have been sued. The plaintiffs have not clearly articulated either in their complaint or on appeal in exactly what capacity they sued the defendants. In their opening brief, they suggest that they sued the defendants in both their official and individual capacities. Appellants' Brief at 13, 22. On the other hand, in their reply brief, the plaintiffs state clearly that this suit is an individual capacity action only. Appellants' Reply Brief at 3, 5–6, 7 ("[T]his is an individual-capacity action. It is not an action against a state or municipality, or against state or municipal employees in their official capacities."). We take plaintiffs at their last word and accordingly, conclude that plaintiffs are seeking to hold the defendants liable only in their individual capacities.

This does not end our inquiry, however, because the defendants argue that the complaint states a claim against them only in their official capacities. As noted, the district court treated this action as simply an official capacity suit. Before addressing the defendants' argument, we shall note briefly significant characteristics of these two types of suits.

■ An individual capacity suit (like an official capacity suit) is an action against a government official for acts committed by that official under color of state law. But an individual capacity action seeks to impose personal liability on the official; any recovery of damages by the plaintiff can be obtained only against the official's personal assets. An official sued in his or her individual capacity can raise relevant personal immunity defenses, such as objectively reasonable reliance on existing law. *Graham,* 473 U.S. at 165–67, 105 S.Ct. at 3105–06; *Brunken v. Lance,* 807 F.2d 1325, 1329 (7th Cir.1986).

---

4. The district court's findings of fact and conclusions of law are an edited transcript of the court's findings and order given orally at the close of final arguments on November 26, 1985.

5. The plaintiffs have also dropped their claim for an injunction and seek only declaratory relief and damages.

■ An official capacity suit is essentially one against the government entity of which the defendant is an official, and any damage award must be satisfied by the entity itself. In such a suit, a plaintiff must establish that the government entity's policy or custom played a part in the violation of federal law. *Graham,* 473 U.S. at 166, 105 S.Ct. at 3106. Although personal immunity defenses are unavailable in an official capacity action, *Graham,* 473 U.S. at 167, 105 S.Ct. at 3106; *Duckworth v. Franzen,* 780 F.2d 645, 649 (7th Cir.1985), *cert. denied,* —— U.S. ——, 107 S.Ct. 71, 93 L.Ed.2d 28 (1986), the Eleventh Amendment restricts the nature of the relief a plaintiff can recover in an official capacity suit. This constitutional provision protects the state from paying its own funds as damages for past conduct, unless the state has waived this defense or Congress has validly overridden it. The Eleventh Amendment, however, does not bar the award of injunctive or declaratory relief requiring a state official to conform his or her behavior to the requirements of federal law in the future, *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), nor does it bar the award of monetary relief that is merely ancillary to injunctive relief, *Graham,* 473 U.S. at 169 n. 18, 105 S.Ct. at 3107 n. 18.

■ In support of their claim that they were sued solely in their official capacities, the defendants point to paragraph four of the amended complaint which reads as follows:

> 4. Each and all of the acts of Defendants alleged herein were done by Defendants not as individuals, but under the color and pretense of the statutes, regulations, customs and usages of the State of Illinois, and under the authority of their offices in the Pontiac Correctional Center.

Amended Complaint, Count 1, ¶ 4. We agree with the plaintiffs, however, that this allegation does not resolve the question. This paragraph simply alleges a prerequisite of any 1983 suit, whether official or individual, that the conduct complained of be committed by the defendant acting under color of state law.

The totality of circumstances here suggests that the plaintiffs did seek to sue the defendants in their individual capacities. These circumstances include the fact that, although the defendants left office during the course of this suit, their successors in office were not substituted as defendants. *See Graham,* 473 U.S. at 166 n. 11, 105 S.Ct. at 3105 n. 11 ("In an official-capacity action in federal court, death or replacement of the named official will result in automatic substitution of the official's successor in office. *See* Fed.Rule Civ.Proc. 25(d)(1); Fed.Rule App.Proc. 43(c)(1); this Court's Rule 40.3."); *Duckworth v. Franzen,* 780 F.2d at 650. If this were an official capacity suit, one would have expected the parties to point out to the district court the need to alter the named defendants. In addition, the plaintiffs here sought monetary damages which, as noted, are not generally available in an official capacity suit. Finally, the defendants apparently never raised a defense based on the Eleventh Amendment; they, however, did raise a qualified immunity defense in the district court, which is available only in individual capacity suits. Amended Answer & Jury Demand, at 6. This last point provides some evidence that the defendants themselves believed that they were sued in their individual capacities. And on appeal the plaintiffs have clearly abandoned their official capacity claims and with them their claim to forward-looking relief. We shall now therefore consider whether the plaintiffs have established a claim against the defendants in their individual capacities.

### III.

■ In cases like this one, prisoners' rights to be afforded a reasonable opportunity to exercise their First Amendment rights must be balanced against the legitimate goals of the penal institution. *See Caldwell v. Miller,* 790 F.2d 589, 596 (7th Cir.1986); *Madyun v. Franzen,* 704 F.2d 954, 958 (7th Cir.), *cert. denied,* 464 U.S. 996, 104 S.Ct. 493, 78 L.Ed.2d 687 (1983). In two recent cases, the Supreme Court has

clarified the standard to be used in reviewing prisoners' constitutional claims that require such a balancing. *Turner v. Safley,* —— U.S. ——, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987); *O'Lone v. Shabazz,* —— U.S. ——, 107 S.Ct. 2400, 2404, 96 L.Ed.2d 282 (1987).[6] Under this standard

> when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.

*Turner,* 107 S.Ct. at 2261; *see also O'Lone,* 107 S.Ct. at 2404. The Court elaborated on this standard by suggesting several factors that are relevant in applying it. These factors include the following: (1) whether a valid, rational connection exists between the regulation and a legitimate government interest behind the rule; (2) whether there are alternative means of exercising the right in question that remain available to prisoners; (3) the impact accommodation of the asserted constitutional right would have on guards and other inmates and on the allocation of prison resources; and (4) although the regulation need not satisfy a least restrictive alternative test, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable. *Turner,* 107 S.Ct. at 2262.

### A.

■ Applying this standard to the cancellation of services due to the absence of a Muslim chaplain, we conclude that the defendants' policy did not deprive the plaintiffs of their free exercise rights under the First Amendment. Not having the benefit of *Turner,* the district court focused primarily on the first factor posited by the Supreme Court: whether a valid connection exists between the regulation and a legit-

imate government interest. The district court accepted the defendants' position that cancellation of services, if a chaplain was not available to run or supervise the service, furthered the interest of security. On appeal, the plaintiffs contend that security is not promoted by the policy. But the district court's finding on this point is one of fact which we must accept unless it is clearly erroneous. Fed.R.Civ.P. 52(a); *Anderson v. City of Bessemer City,* 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985).

During the trial, prison officials testified that security would be jeopardized by granting inmates positions of authority as religious leaders over other inmates, Tr. at 94 (Horn); Tr. at 200–01 (Wright), and that conflicts might arise because inmates lacked the requisite religious expertise to resolve issues that arose during the religious meeting, Tr. at 94–95 (Horn).[7] The officials expressed the concern that religious services led by inmates might be used for gang meetings, Tr. at 196 (Chrans); Tr. at 201, 203 (Wright), and for the dissemination of views interfering with order in the prison, Tr. at 79, 81, 84 (Fairman). On appeal, the plaintiffs argue against the legitimacy of these concerns on a number of grounds. None of the contentions made by the plaintiffs, however, convinces us that the district court's finding on this point was clearly erroneous.

■ The plaintiffs first argue that Muslims do not present a security risk in the prison because they represent a relatively small group; the district court found that of the approximately 2,000 inmates in Pontiac at any given time, only 50 or so express adherence to the Muslim faith or

---

6. *O'Lone* and *Turner* were decided after oral argument was heard in this case. Not having had the benefit of these two cases, the parties argued their positions under the existing case law from this circuit which includes cases such as *Cooper v. Pate,* 382 F.2d 518 (7th Cir.1967); *Madyun v. Franzen,* 704 F.2d 954 (7th Cir.), *cert. denied,* 464 U.S. 996, 104 S.Ct. 493, 78 L.Ed.2d 687 (1983); and *Caldwell v. Miller,* 790 F.2d 589 (7th Cir.1986). *O'Lone* and *Turner* have served to clarify and amplify, rather than to depart from, the standard applied in those cases.

Thus, although we refer to *O'Lone* and *Turner* as establishing the governing standard, the arguments made by the parties under prior cases from this circuit are relevant to the inquiries provided under these recent Supreme Court cases.

7. Defendant Horn testified that the policy of no inmate-led services applied to all religious groups at Pontiac. Tr. at 96 (Horn); *see also* Tr. at 106 (Grant).

have indicated a desire to attend religious services. The plaintiffs also point out that the prison has not experienced any previous disciplinary problems with the Muslim community and that inmates had led services before and after the period in question without incident.[8] These factors do not undermine the rationale offered by the defendants here. Although the size of the Muslim community is small relative to the entire prison population, it is not only large groups that pose security problems in prisons. In response to the other arguments raised by the plaintiffs, prison officials need not wait for a problem to arise before taking steps to minimize security risks. *See, e.g., Butler-Bey v. Frey*, 811 F.2d 449, 451 (8th Cir.1987); *Caldwell*, 790 F.2d at 599; *Azeez v. Fairman*, 795 F.2d 1296, 1299 (7th Cir.1986).[9] The prison officials here have identified a legitimate security concern. *See Tisdale v. Dobbs*, 807 F.2d 734, 738–39 (8th Cir.1986) (presence of free-world sponsor at group religious meetings upheld as legitimate security measure).[10]

The plaintiffs also take issue with the district court for relying on testimony about a 1984 disturbance caused by a prisoner attempting to organize a prayer meeting. The plaintiffs point out that this disturbance could not have been a factor in adopting the policy at issue here because that disturbance occurred after the policy was adopted. The plaintiffs also claim that the 1984 disturbance, which involved an inmate's attempting to hold a controversial prayer meeting in the prison yard, cannot be compared to inmate-led services held in a secure room in the presence of a guard. But the plaintiffs misunderstand the point for which this evidence was offered. The testifying prison official did not claim that the 1984 disturbance helped cause the prison to adopt the policy at issue here; instead, the 1984 event bolstered the prison officials' claim that inmate-led services could lead to security problems. Tr. at 190–91, 193–96 (Chrans). And, as the defendants point out, although the presence of a correctional officer at an inmate-led service might prevent the immediate outbreak of violence, the officer (unlike a chaplain) could not resolve a doctrinal dispute potentially leading to a fight. The district court correctly decided that the cancellations for lack of a chaplain served a legitimate government interest.

The second factor suggested in *Turner* is whether "there are alternative means of exercising the right that remain open to prison inmates." *Turner*, 107 S.Ct. at 2262. In *O'Lone*, the Court upheld a prison regulation that precluded prisoners who

---

**8.** Under a prior administrative regulation, A.R. 839, which was in effect during the period at issue here, religious groups that were without the services of a clergyman could request the Administrative Chaplain for the IDC to permit inmate-conducted services. Defendant Horn decided in 1976 or 1977 not to approve any such requests due to security concerns. Tr. at 93 (Horn). In 1981, however, a state court issued a writ of mandamus requiring the prison to permit inmate-run services if no chaplain was available. A.R. 839 was superseded by IDC Rule 425.20 on August 1, 1984; Rule 425.20 does not contain any reference to inmate-conducted services.

The plaintiffs are not claiming here that A.R. 839 created any right to inmate-led services. Appellants' Reply Brief at 14.

**9.** Plaintiffs also argue that the defendants' security concerns could not have been a factor behind the policy because defendants have allowed prisoners to be elected to leadership positions within the Muslim community in prison. The trial transcript suggests that the Muslim chaplain and some unspecified administrators knew of this practice; it is not clear that prison officials actually authorized it. Tr. at 117, 135–36 (Muhammad). Even if prison officials did allow Muslims to hold leadership positions, it is not inconsistent for them to prohibit inmate-led services. One of the fears associated with inmate-led services that is not presented by mere Muslim leadership positions is that at services prisoners would have an opportunity to disseminate to a group information contrary to prison policies. Allowing prisoners to lead religious services also gives them a greater position of authority over other inmates than do many other leadership positions.

**10.** Plaintiffs contend that *Tisdale* is distinguishable because in that case the prison administrators testified that unsupervised religious meetings had posed a security problem in the past. As noted, however, correction officers can take action to prevent a security problem from arising. The officers need not wait for the problem to occur before taking action so long as they are acting on the basis of a legitimate security concern.

were part of a work gang detailed on assignments outside the prison from coming back at midday for Jumah; these prisoners were completely denied the opportunity to attend Jumah. In applying this factor in *O'Lone*, the Court found that, although there were no alternative means for these prisoners to attend Jumah, the prisoners "retain[ed] the ability to participate in other Muslim religious ceremonies." *O'Lone*, 107 S.Ct. at 2406. The Court found that this fact tended to support the reasonableness of the Jumah restriction.

In this case, of course, it is undisputed that the plaintiffs are afforded the opportunity to fulfill a number of their religious obligations. The prison has had a full-time Muslim chaplain to minister to the spiritual needs of the Muslim prisoners since 1979; in addition to conducting Jumah, the Muslim chaplain also ministers individually to the Muslim prisoners. Tr. at 60 (Hadi); Tr. at 140–41 (Muhammad); Tr. at 180 (Allah). Until 1981 the prison had a policy that a chaplain had to arrange for a substitute if he knew he could not be present for a service. Tr. at 200 (Wright).[11] Special arrangements have been made since at least 1979 to enable Muslim prisoners to observe the fast of Ramadan and the feast of 'Id-ul-Fitr.[12] Tr. at 175–76 (Allah). The Muslim prisoners also have access to religious materials. Tr. at 162 (Akbar). In addition, the prison scheduled weekly study classes for the Islamic prisoners. Tr. at 144 (Muhammad); Tr. at 199 (Wright). Most important, the policy at issue here imposes a much less intrusive burden on the ability of Muslim prisoners to attend Jumah than the policy upheld in *O'Lone*. The policy in *O'Lone* absolutely precluded particular categories of prisoners from attending Jumah. In the case before us, by contrast, Jumah has been cancelled only occasionally because of the absence of a chaplain; thus, the Muslim prisoners have not been denied most Jumah participation.[13]

The next factor the Court suggested is the impact that accommodation of the asserted constitutional right would have on the institution. If the prison officials allowed Muslim inmates to lead Jumah services, they would also have to extend this right to other religious groups which would most likely demand equal treatment. Tr. at 84–85 (Fairman). This ripple effect would end up compounding the security problems that underlie the policy.

Finally, we consider whether any obvious alternative exists suggesting that the defendants' conduct here was unreasonable. In this connection, the plaintiffs suggest that prison officials could have accommodated their demand short of an absolute ban on inmate-led services. The plaintiffs argue that the security rationale may justify forbidding inmates to give the Jumah sermon but this rationale does not explain why inmates may not lead the prayer portion of Jumah. We reject this approach because, although it might avoid doctrinal disputes, it still places an inmate in a position of authority over other inmates in the context of a religious service. As another alternative, the plaintiffs suggest that the defendants should have permitted the services if a chaplain of any denomination

---

**11.** For at least some of the cancelled services, the Muslim chaplain apparently made arrangements for an individual from outside Pontiac to lead the prayer service, Tr. at 35 (Hadi); the substitute Imam was refused entry to Pontiac on at least one occasion because the appropriate officials had not been notified that he would be coming, Tr. at 204 (Wright).

Defendant Wright testified that some time in 1981 the prison adopted a policy allowing any chaplain to supervise services if a chaplain of the appropriate denomination was not available. Tr. at 207–08 (Wright).

**12.** Ramadan is a month-long period of fasting and prayer. During Ramadan, Pontiac makes special arrangements to enable Muslim prisoners to observe the period of fasting and daily services. Some testimony indicated that Ramadan had been held at Pontiac even before 1979. Tr. at 43–44 (Hadi); Tr. at 108–09 (Grant); Tr. at 142 (Muhammad); Tr. at 161–62 (Akbar). 'Id-ul-Fitr is the Islamic feast that takes place after Ramadan.

**13.** The district court did not make any findings as to how often services had been cancelled because no chaplain was available. According to the plaintiffs, Jumah has been cancelled at least five times in 1979 and 1980 for this reason.

were present to supervise them.[14] This suggestion, however, does not fully meet the defendants' security concerns. A Muslim chaplain is in a better position to resolve doctrinal disputes that might arise at a service than is a chaplain of another denomination with only limited exposure to the tenets of Islam.

### B.

We shall next consider under the *Turner* factors the cancellation of Jumah services due to scheduling conflicts. The district court found that Jumah had been cancelled for this reason approximately a half-dozen times during the five-year period prior to the 1985 trial. Order at 4. The plaintiffs claim that approximately this number of cancellations took place between 1979 and 1982, the year the last defendant was at Pontiac.[15] Jumah had been cancelled due to recreational activities, such as concerts, picnics and movies, that had been scheduled for the same time and place as the Jumah service.[16]

On appeal, the plaintiffs claim that these cancellations did not further a legitimate government interest because the defendants could simply have rescheduled the other activities for another time. On this point, the district court stated:

Certainly no important state objective can be discerned in showing a ... movie rather than having the established prayer service. The prayer service is required to take place at a specific time and a specific day and the ... movie could be shown at any number of other times.... Certainly better accommodation than that could be afforded.

Order at 15. This conclusion appears to collapse two of the *Turner* factors: the requirement that there exist a valid connection between the burden and a legitimate government interest and the requirement that obvious alternatives not exist. We consider each point in turn.

Review of the trial transcript discloses the sparseness of testimony on the issue in question. When questioned on the point, the prison officials testified, for the most part, that they simply did not remember the occasions on which Jumah had been cancelled in favor of conflicting events. *See, e.g.,* Tr. at 70–71, 86 (Fairman). This testimony seems perfectly plausible in light of the limited number of cancellations due to conflicts and the fact that these cancellations were ad hoc reactions to conflicts rather than the result of any policy.

The cancellations of services in favor of recreational activities were, in our view, actions in furtherance of an important government interest. Meeting the recreational needs of prisoners with the concomitant boost to morale and the resulting enhancement of security is a legitimate government interest. The real issue here, and the issue addressed by the statement of the district court quoted above, is whether prison officials should be held liable in damages for failing on isolated occasions to accommodate the religious needs of inmates.[17] Under the circumstances of this

14. There is some dispute in the record about the exact circumstances under which services were cancelled while the defendants were at Pontiac. Some witnesses testified that Jumah was cancelled when neither the Muslim chaplain nor an outside Imam was available. Tr. at 32, 35–36, 38 (Hadi); Tr. at 105 (Grant). The plaintiffs also take this position on appeal. However, testimony was also given which indicated that Jumah would not be cancelled so long as a chaplain of any denomination was available to supervise it. Tr. at 78 (Fairman). We need not resolve this dispute because, as discussed in the text, even if we accept the plaintiffs' position, the defendants' actions can be upheld under a security rationale.

15. In the context of an individual capacity suit, only the conduct of the named defendants during the period they were in their official positions is relevant. In this case, the last defendant left Pontiac in 1982.

16. The testimony suggests that the religious services of other groups were also occasionally cancelled due to scheduling conflicts with other events. Tr. at 219–20 (Akin).

17. The district court's remarks concerning whether the prison officials should have always accommodated Jumah are dicta; in connection with the cancellations due to scheduling conflicts, the court held only that the defendants could not be held liable for the cancellations in their official capacities because the plaintiffs did not establish a policy.

case, we think that the defendants here should not be held liable.

The prison officials' inability to recall most of the cancellations due to scheduling conflicts made it impossible for them to testify as to the necessity for these cancellations.[18] On appeal, the defendants argue that these cancellations were simply the result of the prison's attempt to accommodate the religious, social and recreational needs of the approximately 2,000 prisoners at Pontiac within the resources available in a penal facility.[19] The plaintiffs simply assert on appeal that the defendants should have accommodated their service in some way, either by rescheduling the conflicting recreational activity or by finding another location for their service.[20] The plaintiffs did not offer any evidence, however, that rescheduling the other activity was a realistic alternative or that the plaintiffs had proposed to the defendants an alternative site at which a service or the conflicting activity could have been held. It is undisputed that the chapel serves as the sole recreational facility at the prison for activities such as movies and concerts.[21] Given the limited number of cancellations here, the plaintiffs' failure to demonstrate a feasible alternative and the legitimate goal served by the other scheduled activities, we cannot say that the plaintiffs' First Amendment rights were violated.

 The remaining inquiries under *Turner* also do not support a finding of constitutional violation. With respect to whether alternative means for Muslim worship existed, we simply note again our observation that Pontiac made available during the period at issue a number of avenues through which the plaintiffs could practice their faith. We emphasize that, except for approximately a half-dozen times between 1979 and 1982, the plaintiffs were able to attend Jumah services. Lastly, if the defendants *did* attempt always to accommodate the Muslims and never cancelled Jumah due to scheduling conflicts, the officials probably would have been forced to reduce the number of other activities in which prisoners could participate.[22]

We emphasize that our conclusion here is dictated by the specific facts relating to the occasional and sporadic nature of the cancellations, the availability of other religious opportunities, the conflict with important claims of other inmates and the limited facilities available for all prisoners. Certainly, we do not derogate the fundamental right to exercise one's religion freely and fully.

The decision of the district court is

AFFIRMED.

18. The warden of Pontiac during 1979–82 provided the only testimony on this point. When asked whether an event such as a picnic would be sufficient reason to cancel Jumah, the warden testified that it might, "depend[ing] on the participation level and … on what other activities are going on at the facility." Tr. at 72 (Fairman).

19. The district court found that there are approximately fifty inmates who adhere to the Al-Islam faith. Order at 2–3. The Muslim chaplain at Pontiac testified that about ten to twelve inmates on average attend the Jumah service held for the general population. Tr. at 174 (Allah). Records kept for part of 1981, however, indicate that, on average, approximately twenty-five inmates from the general population attended each Jumah service. Pl. Ex. 6.

20. Plaintiff Hadi testified that the prison officials on one occasion had offered an alternative site for the Jumah service. Warden Wright offered the weight room for Jumah, but the Muslim prisoners turned down this suggestion because they thought it would be an insult to hold their service there. Tr. at 31 (Hadi).

21. Plaintiff Hadi testified that the chapel was the

only place that [Pontiac] had for leisure-time activities. The chapel included a stage and auditorium. It was together. It was a multipurpose building. And the area that was used for Jumah prayer was also used for leisure-time activities, such as band concerts, movies, et cetera.

Tr. at 30 (Hadi).

22. Even if we were to find a constitutional violation here, the defendants would be clothed with qualified immunity since the case law at the time in question would not have put them on notice that occasional cancellations for the reasons and under the circumstances described here exposed them to damage liability.