**Paul KNOX, Plaintiff–Appellant,**

v.

**Kenneth L. McGINNIS and Thomas Roth, Defendants–Appellees.**

No. 91–3527.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 12, 1992.

Decided July 20, 1993.

Todd A. Smith, Corboy & Demetrio, David A. Novoselsky (argued), Novoselsky & Associates, Chicago, IL, for plaintiff-appellant.

Jan E. Hughes, Asst. Atty. Gen., Civ. Appeals Div., Chicago, IL (argued), for defendants-appellees.

Before MANION and ROVNER, Circuit Judges, and REYNOLDS, Senior District Judge.*

ILANA DIAMOND ROVNER, Circuit Judge.

In this prisoner civil rights action, Paul Knox alleges that officials at Stateville Correctional Center ("Stateville") subjected him to cruel and unusual punishment in violation of the eighth amendment when they restrained him with a mechanism comprised of a waist chain, handcuffs, and a "black box." Prison officials used this restraint on Knox and on all other segregation prisoners when they were transported outside the segregation unit. The district court granted summary judgment in favor of defendants Ken-

---

* The Honorable John W. Reynolds, Senior District Judge for the Eastern District of Wisconsin, sitting by designation.

neth L. McGinnis and Thomas Roth[1] on a number of alternative grounds. *See Knox v. McGinnis*, 783 F.Supp. 349 (N.D.Ill.1991). We affirm.

## I.  FACTS

Knox is an inmate at Stateville.  On February 21, 1990, prison officials discovered four homemade knives, two of which were approximately twenty inches long, two metal bar pieces, a metal file, and several pieces of sandpaper in Knox' cell in a hollowed-out section of a board that was used as a bookshelf.  Although he alone had occupied the cell for the preceding four to five months, Knox maintained that the contraband did not belong to him.  A disciplinary report issued against Knox, and he ultimately was found guilty of possessing dangerous contraband. Prison officials accordingly revoked one year of Knox' statutory "good time" and transferred him to the segregation unit.

As a "segregation" prisoner, Knox was required to wear handcuffs, a waist chain, and a black box whenever he left the segregation unit either to receive visitors or to visit the prison hospital or law library.[2]  The black box and waist chain were not used when Knox was in his cell, when he was taken to the shower, or during meals.  The "black box" is a hard plastic box placed over the lock apparatus that runs between the prisoner's handcuffs.  The box does not cover the hands, but is situated between them.[3]  A chain runs through the box and encircles the prisoner's waist.  The chain is tightened and then locked in back so that the prisoner's hands, restrained by handcuffs and the black box, are pulled against his stomach.  The black box is used on all segregation prisoners to prevent them from picking the locks on their handcuffs.

Knox remained in segregation from March 1 to October 1, 1990, and was subject to use of the black box during that period.[4]  He has since returned to the general prison population.

Knox maintains that the black box caused him severe discomfort and physical injury. The device required that his arms remain in close proximity to one another and to his chest, making it impossible for him to bring his arms or hands together.  This posture caused the handcuffs to cut into Knox' wrists whenever he moved his arms.  The device left indentations on Knox' wrists and sometimes caused bleeding.[5]  Knox also experienced persistent pain in his hands and numbness in his thumb.  He still occasionally has pain in his left hand that prevents him from making a fist.  Although Knox took Tylenol for the pain, he did not seek any other medical treatment.  He did request that prison or hospital officials loosen or remove the device once he arrived at the hospital or visiting room, but those requests were refused.

---

1.  McGinnis is the former Director of the Illinois Department of Corrections, and Roth is Stateville's warden.

2.  Knox sometimes was required to wear the restraining device for extended periods.  For example, the walk to the law library took approximately twenty minutes.  During that time, Knox usually would carry a laundry bag full of books and legal notes.  The weight of the laundry bag would pull his hands downward, causing the handcuffs to cut into his wrists.  Prison officials would remove the black box while Knox worked in the library, but they did not remove the restraint while Knox waited for a doctor at the prison hospital, despite the fact that Knox was held in a locked cage.  Knox also was required to wear the restraint for up to two hours at a time while receiving visitors.

3.  The Eighth Circuit recently described the black box as a mechanism "applied over the chain and lock area of conventional handcuffs to form a rigid link between the two wristlets."  *Moody v. Proctor*, 986 F.2d 239, 240 n. 3 (8th Cir.1993).

4.  Prior to February 1990, Knox had previously been placed in segregation in 1986, when guards found a knife in the "crank box" of his cell door.

5.  Similar allegations of discomfort from the black box were made by the plaintiffs in *Moody v. Proctor, supra*, and *Fulford v. King*, 692 F.2d 11 (5th Cir.1982).  Moody maintained that the black box "inflicted pain to his wrists—immediate shooting pains up and down his left arm and some swelling, and throbbing pain and numbness that lasted a few weeks."  986 F.2d at 240. The inmates in *Fulford* testified that the box held their wrists and arms in a "rigid, unnatural position" and that it caused numbness and marks on the skin.  692 F.2d at 13.

The district court concluded that defendants were entitled to qualified immunity on Knox' damages claims under 42 U.S.C. § 1983 because use of the black box on a segregation prisoner did not violate a clearly established right under the eighth amendment. *Knox*, 783 F.Supp. at 351–52.[6] The district court alternatively found that Knox' damages claims must fail because neither defendant had been personally involved in the allegedly wrongful conduct. *Id.* at 352. As for Knox' claim for injunctive relief, the district court questioned whether Knox had standing to assert such a claim because, having been released from segregation and returned to the general prison population, Knox no longer was subject to use of the black box. *Id.* at 352–53. In any event, even if Knox had standing, the district court found that he had failed to establish an eighth amendment violation. *Id.* at 353.

## II. ANALYSIS

### A. Lack of a Response to the Summary Judgment Motion.

Knox initially challenges the district court's refusal to accept his tardy response to defendants' summary judgment motion. Although his response was due by September 5, 1991, and although the district court ruled on September 30, 1991, Knox argues that the district court should have accepted his response to the summary judgment motion when it was filed on October 2, 1991.[7] Knox contends that his inability to respond enabled the district court to assume the truth of

defendants' factual assertions and to disregard any factual disputes that he might have raised. *See* Rules 12(m), (n) of the General Rules of the United States District Court for the Northern District of Illinois; *see also Wienco, Inc. v. Katahn Assoc., Inc.*, 965 F.2d 565, 567 (7th Cir.1992); *Appley v. West*, 929 F.2d 1176, 1179–80 (7th Cir.1991); *Skagen v. Sears, Roebuck & Co.*, 910 F.2d 1498, 1500 (7th Cir.1990).

The district court did not abuse its discretion in refusing to accept the tardy response. *See In re Narowetz Mechanical Contractors, Inc.*, 898 F.2d 1306, 1309–10 (7th Cir.1990). The district court already had issued its opinion when Knox' court-appointed counsel requested permission to file the response. Thus, this is not a situation where the district court refused to accept a submission that was a few days late. This response was almost one month late and was submitted only after the district court had issued its decision. In today's climate of crowded dockets and limited judicial resources, a district court is not required to accept and to consider a response that is submitted after the court has ruled on a motion. *See United States v. Kasuboski*, 834 F.2d 1345, 1351–52 (7th Cir.1987) (affirming refusal to consider response to motion for summary judgment where both request for extension of time and response itself were submitted after decision on summary judgment motion). Instead, we agree with the district court that Knox waived his right to file a response.[8]

---

6. Like the district court, we follow the convenient yet imprecise practice of referring to the eighth amendment itself, rather than to the eighth amendment as applied to the states through the fourteenth amendment. *See Knox*, 783 F.Supp. at 352 n. 4; *see also Wilson v. Seiter*, —— U.S. ——, ——, 111 S.Ct. 2321, 2323, 115 L.Ed.2d 271 (1991); *Marshall v. Allen*, 984 F.2d 787, 789 (7th Cir.1993).

7. An affidavit from Knox' counsel accompanying the response explained that his tardiness resulted from an error on his firm's docketing system.

8. Even if the district court had accepted and considered Knox' tardy response, it still could have assumed the truth of the factual assertions in defendants' Local Rule 12(m) statement because Knox failed to submit a responsive statement in accordance with Local Rule 12(n). Rule

12(n) requires a statement responding "to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." Knox did not attempt to submit such a statement here, instead setting out his version of the facts in the body of his responsive memorandum. We reiterate that this practice does not comply with the stringent requirements of the Northern District's local rule, and when presented with a non-conforming factual narrative, the district court may deem admitted the factual assertions of the moving party. *See Valenti v. Qualex, Inc.*, 970 F.2d 363, 368–69 (7th Cir. 1992); *Appley*, 929 F.2d at 1179–80; *Bell, Boyd & Lloyd v. Tapy*, 896 F.2d 1101, 1103 (7th Cir. 1990).

In any event, we find that consideration of Knox' tardy response would have little impact on our analysis. The district court explained that it did not pursue a response from Knox' counsel before ruling because it found "the legal situation so plain that the case can fairly be dealt with in its present posture." *Knox*, 783 F.Supp. at 350–51. We agree that Knox suffered no prejudice from his counsel's error, for in granting summary judgment, the district court reviewed the entire transcript of Knox' deposition and based its resolution of the motion on the facts to which Knox himself had testified. *See id.* at 351 n. 3. Having independently reviewed that transcript, we agree that even when viewed in its most favorable light, Knox' testimony does not create a factual issue that would preclude a grant of summary judgment.

### B. Qualified Immunity.

We review a district court's grant of summary judgment de novo, viewing the record and all reasonable inferences that may be drawn therefrom in the light most favorable to Knox. *Williams v. Anderson*, 959 F.2d 1411, 1413 (7th Cir.1992). We must determine whether the record reveals the absence of a genuine issue of material fact such that defendants would be entitled to judgment as a matter of law. *Id.;* Fed.R.Civ.P. 56(c).

Our analysis of the qualified immunity question begins with *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), where the Supreme Court held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." 457 U.S. at 818, 102 S.Ct. at 2738; *see also Williams*, 959 F.2d at 1414. Qualified immunity focuses on the "objective legal reasonableness" of defendants' conduct. *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987); *see also Marshall v. Allen*, 984 F.2d 787, 792 (7th

Cir.1993). As we have previously explained, "[a]ctions taken by local officials are considered objectively unreasonable only if the right allegedly violated is clearly established in a sufficiently particularized sense at the time of the actions at issue." *Hall v. Ryan*, 957 F.2d 402, 404 (7th Cir.1992); *see also Marshall*, 984 F.2d at 792; *Azeez v. Fairman*, 795 F.2d 1296, 1301 (7th Cir.1986). The qualified immunity defense therefore depends on the state of the law at the time of the alleged constitutional violation. *Marshall*, 984 F.2d at 792; *Williams*, 959 F.2d at 1414.

Our task, then, is to determine whether it was clearly established between March 1 and October 1, 1990, that use of the black box restraint on a segregation prisoner who was taken outside the segregation unit would violate the eighth amendment. The district court determined that it would not, noting that prior case law has "looked in the other direction," with the only circuit considering the question finding use of the black box consistent with the Constitution. *See Knox*, 783 F.Supp. at 351–52 (citing *Fulford v. King*, 692 F.2d 11 (5th Cir.1982)).[9] But Knox argues that immunity should not attach here because the prison officials did not limit themselves to the particular use of the black box condoned in *Fulford*—that is, in this case, unlike *Fulford*, officials used the black box inside as well as outside the prison confines. According to Knox, the qualified immunity defense "is available to protect defendant[s] *only as far as* case law establishes that th[e] use is constitutional. Beyond these limits, qualified immunity does not apply." (Knox Br. at 18 (emphasis in original).)

Knox misunderstands the qualified immunity doctrine. The question is not whether the conduct is clearly constitutional, but whether it is clearly unconstitutional. Knox' proposed test would focus on whether courts have specifically sanctioned particular conduct, whereas the correct inquiry is

---

9. The district court also relied on the decisions in *Tubwell v. Griffith*, 742 F.2d 250 (5th Cir.1984), and *Hanna v. Lane*, 610 F.Supp. 32 (N.D.Ill. 1985), as establishing the state of the law on the use of similar prisoner restraints. *See Knox*, 783 F.Supp. at 352 n. 5. Those cases also are discussed below.

whether courts have found the conduct unconstitutional or have defined a constitutional right in such a way that " 'a reasonable official would understand that what he is doing violates that right.' " *McDonald v. Haskins,* 966 F.2d 292, 293 (7th Cir.1992) (quoting *Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039 (citations omitted); *see also Marshall,* 984 F.2d at 794. Application of this test "does not require a prior case that is 'precisely on all fours on the facts and law.' " *McDonald,* 966 F.2d at 293 (quoting *Landstrom v. Illinois Dep't of Children & Family Servs.,* 892 F.2d 670, 676 (7th Cir.1990)). Rather, we are concerned with whether the law was clear "in relation to the specific facts confronting the public official[s] when [they] acted." *Rakovich v. Wade,* 850 F.2d 1180, 1209 (7th Cir.) (en banc), *cert. denied,* 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 534 (1988); *see also McDonald,* 966 F.2d at 294.

Knox concedes that during the relevant time period, case law clearly established that use of the black box in the transportation of prisoners outside the prison did not violate the eighth amendment. Knox maintains, however, that the same cannot be said for use of the black box when transporting segregation prisoners within the prison. In advancing this argument, Knox attaches considerable weight to *Fulford's* brief mention of that distinction. *See* 692 F.2d at 14–15. From this, Knox presumably would argue that case law clearly established that use of the black box on a segregation prisoner inside the prison constituted cruel and unusual punishment.[10] We cannot agree that *Fulford* or any other decision would have alerted defendants that their use of the black box

within the prison walls would violate a prisoner's eighth amendment rights.

Between March and October 1990, *Fulford* was the major circuit court decision addressing use of the black box. The plaintiffs in that case had been confined in the "close cell restricted" ("CCR") unit of a state penitentiary. This unit was set aside for prisoners who either presented a danger to others or who might themselves be at risk if housed in the general prison population. 692 F.2d at 12–13. The plaintiffs challenged two distinct prison policies: (1) that they be "fully restrained" by handcuffs, a waist chain, and leg shackles on trips to other parts of the prison, and (2) that they wear a black box over their handcuffs when traveling outside the prison. *Id.* at 13. The Fifth Circuit found that the first policy did not violate the prisoners' equal protection rights because it was rationally related to the state's interest in maintaining prison security. *Id.* at 13–14.[11] As for the black box, the court found this additional restraint justified "by the greater risk of escape when prisoners are outside the institution and [by] the reduced number of guards available to oversee the prisoners during those journeys." *Id.* at 14. The Fifth Circuit explained that

> [r]equiring all CCR prisoners to wear a black box when outside the prison does not violate the eighth amendment. Its use may inflict some discomfort, such as numbness of the arms and temporary marks, but the record does not show that prisoners are exposed to great pain or that any of their discomfort is occasioned either deliberately, as punishment, or mindlessly, with indifference to the prisoners' humanity. The box's use outside of the prison is for a rational reason, security, and is directed by a standard prison policy, not left to unfettered discretion of guards. Under these circumstances, it is not within our power to substitute our judgment for that of the prison officials.

---

10. This is not the precise argument Knox advances on appeal, for he contends that case law did not clearly establish that use of the black box inside the prison was constitutional. We have explained how that argument misunderstands the controlling law. Our discussion of Knox'

position on the qualified immunity issue thus assumes a correct interpretation of our precedents.

11. The plaintiffs did not invoke the eighth amendment in challenging these restraints.

*Id.* at 14–15;[12] *see also Jackson v. Cain,* 864 F.2d 1235, 1243–44 (5th Cir.1989) (use of handcuffs, shackles, and a waist chain outside prison did not violate the eighth amendment).

As Knox points out, *Fulford* also noted trial testimony indicating that the black box may have been used inside the prison at the discretion of a supervisor. However, the court found no evidence that the black box "was frequently so used or that its use was arbitrary or punitive." *Id.* at 15. Although the court discredited the prisoners' contention that the box was used in retaliation for their lawsuit, it did note that "use of the black box as a retaliatory or punitive measure would be an element in deciding whether black boxes are impressed on inmates within the prison as punishment and, as such, whether this use violates the eighth amendment." *Id.* Although *Fulford* thus leaves open the possibility that retaliatory or punitive use of the black box may be unconstitutional, it does not create a clearly established right to be free from use of the black box inside the prison such that a reasonable prison official would understand that the conduct here would violate that right. *See McDonald,* 966 F.2d at 293. This is especially true where the black box is consistently used on all segregation prisoners moved outside the segregation unit and is not used arbitrarily or only at the discretion of a prison official.

Although *Fulford* did not expressly authorize all uses of the black box within a prison, leaving the door open for Knox' argument here, a later district court decision, which we affirmed on appeal, arguably extends *Fulford* to encompass defendants' conduct. In *Bruscino v. Carlson,* 654 F.Supp. 609 (S.D.Ill. 1987), *aff'd,* 854 F.2d 162 (7th Cir.1988), *cert. denied,* 491 U.S. 907, 109 S.Ct. 3193, 105 L.Ed.2d 701 (1989), Control Unit inmates at the federal correctional facility in Marion, Illinois argued that prison officials violated their constitutional rights by restraining them with handcuffs, a black box, and leg restraints during visits with their attorneys, which occurred within the prison facility. The inmates alleged that the additional restraints, especially the black box, caused tremendous discomfort and made it difficult for them to communicate meaningfully with their attorneys. Although the district court appreciated the inmates' inconvenience and discomfort, it concluded that "the security concerns of prison administrators justify the measures that have been taken." 654 F.Supp. at 617. The court therefore held that "restraining Control Unit inmates with cuffs, a black box and leg restraints during legal visits does not violate their right of access to the courts *or any other constitutional right.*" *Id.* (emphasis added). We affirmed but made only passing reference to use of the black box: "[t]he handcuffing, the shackling, [and] the boxing of the handcuffs ... are reasonable measures in view of the history of violence at the prison and the incorrigible, undeterrable character of the inmates."[13] 854 F.2d at 166.[14]

12. The Eighth Circuit recently followed the *Fulford* rationale in concluding that use of the black box on all prisoners when traveling outside the prison was consistent with the eighth amendment. *See Moody v. Proctor, supra* nn. 3 & 5, 986 F.2d at 241.

13. Crucial to our decision in *Bruscino* was the fact that the Marion facility "is the successor to Alcatraz as the prison designed to hold the most violent and dangerous prisoners in the federal system." 854 F.2d at 163. We described Marion as "the most severe prison in the country," housing "not only the worst federal prisoners but, on a contract basis, state prisoners too violent for state prisons to handle." *Id.* at 164.

14. One other district court opinion addressing use of the black box is noteworthy. In *Burnette v. Phelps,* 621 F.Supp. 1157 (M.D.La.1985), the plaintiffs alleged a violation of their constitutional rights when black boxes were used in transporting them "from their quarters." *Id.* at 1159. Citing *Fulford,* the district court held that the defendants did not violate the inmates' eighth amendment rights by using the black box when transporting prisoners "out of their unit." *Id.* at 1161. The *Burnette* opinion is of limited significance here, however, because it is unclear whether transportation "from their quarters" or "out of their unit" involved travel outside the prison. Although those phrases might suggest travel only within the prison confines, the district court later explained that "[a]lthough plaintiff Burnette suggests that he has never posed any problems on *trips outside the prison,* he does not contest the use of the device as a security measure to ensure that there would be 'no problems.'" *Id.* (emphasis added). This indicates that some movement outside the prison was involved, making *Burnette* more like *Fulford* than *Bruscino.*

Furthermore, courts have sanctioned the use of other highly restrictive restraints within prison confines. In *Tubwell v. Griffith*, 742 F.2d 250 (5th Cir.1984), for example, the Fifth Circuit upheld the use of leg shackles and waist chains on "close custody" [15] inmates traveling to the prison's main law library. In contrast to the instant case, the inmates in *Tubwell* were kept in these restraints while they worked in the library. The court found use of the leg shackles and waist chains appropriate where the main law library was less secure than other areas of the prison. *Id.* at 252. Because "close custody" inmates present increased security risks in a vulnerable area of the prison, the court discerned no eighth amendment violation. *Id.* at 252–53 (citing *Fulford*).

Finally, the district court in *Hanna v. Lane*, 610 F.Supp. 32 (N.D.Ill,1985), sanctioned the use of a security belt and handcuffs on a segregation prisoner while he received visitors. The district court reasoned that courts should be reluctant to interfere with security measures instituted by prison officials and explained that such a measure does not violate the eighth amendment "absent some showing that it constitutes a wanton infliction of pain that is totally without penological justification." *Id.* at 35; *see also Caldwell v. Miller*, 790 F.2d 589, 600 (7th Cir.1986); *Wells v. Franzen*, 777 F.2d 1258, 1264 (7th Cir.1985). The court then focused on the plaintiff's status as a segregation prisoner, explaining that

> [p]risoners in segregation are usually those who have violated prison rules or are under investigation for possible disciplinary action. It is not unreasonable to assume that as a class those prisoners represent a potential threat to security. Therefore, courts have sanctioned the use of mechanical restraints on prisoners in segregation-type status whenever they are taken out of the segregation unit.... For Eighth Amendment purposes, the mere fact of segregation is sufficient to justify use of handcuffs and a security belt for purposes of receiving contact visits.

*Hanna*, 610 F.Supp. at 35–36.

On the whole, these decisions sanction use of restrictive mechanisms, including the black box, on special status prisoners when they are taken outside the prison or when they move inside the prison to particularly vulnerable areas such as the law library or visiting areas. The case law thus fails to delineate a right to be free from use of the black box or other restrictive devices while a segregation prisoner is outside the segregation unit. Because reasonable prison officials would not have understood that their conduct would violate the eighth amendment, defendants are entitled to qualified immunity from Knox' claim for damages.

█ Of course, qualified immunity shields defendants only in their individual capacities (*see Akins v. Board of Governors of State Colleges and Universities*, 840 F.2d 1371, 1375–76 (7th Cir.1988), *vacated*, 488 U.S. 920, 109 S.Ct. 299, 102 L.Ed.2d 319 *on remand*, 867 F.2d 972 (7th Cir.1988) (reinstating original opinion as to named plaintiff); *Hadi v. Horn*, 830 F.2d 779, 782–83 (7th Cir.1987)), and Knox seeks damages against defendants in their official capacities as well. (R. 1.) We agree with defendants, however, that the official capacity claims are barred by the eleventh amendment. It is by now well settled that "[a] suit for damages against a state official in his or her official capacity is a suit against the state for Eleventh Amendment purposes." *Shockley v. Jones*, 823 F.2d 1068, 1070 (7th Cir.1987); *see also Papasan v. Allain*, 478 U.S. 265, 278, 106 S.Ct. 2932, 2940, 92 L.Ed.2d 209 (1986); *Kentucky v. Graham*, 473 U.S. 159, 166, 105 S.Ct. 3099, 3106, 87 L.Ed.2d 114 (1985); *Scott v. O'Grady*, 975 F.2d 366, 369 (7th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 2421, 124 L.Ed.2d 643 (1993). Because the State of Illinois has not consented to being sued in federal court in the statute creating its Department of Corrections (*see* Ill.Rev.Stat. ch. 38, ¶¶ 1001–1201), the official capacity claims for damages are barred by the eleventh amendment. *See Shockley*, 823 F.2d at 1070.

*C. Injunctive Relief.*

█ Neither qualified immunity nor the eleventh amendment shield defendants from

---

**15.** The court described "close custody" inmates as "those inmates considered to present in-

creased security risks because they are dangerous to themselves and to others." *Id.* at 251.

Knox' claim for injunctive relief, however. *See Scott,* 975 F.2d at 369; *Hadi,* 830 F.2d at 783. Knox requests both a preliminary and permanent injunction against further use of the black box. (R. 1.) We interpret this as a claim for prospective injunctive relief against prison officials in their official capacities. *See Akins,* 840 F.2d at 1377; *Scott v. Lacy,* 811 F.2d 1153, 1153–54 (7th Cir.1987).

The district court found that Knox' standing to assert a claim for injunctive relief was questionable because he was released from segregation on October 1, 1990, and returned to the general prison population, where he is no longer subject to use of the black box. *Knox,* 783 F.Supp. at 352–53. Knox' claim for injunctive relief is therefore based only on the possibility that he may again be transferred to the prison's segregation unit. The district court thought this possibility insufficient to establish an actual case or controversy under *City of Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). *See Knox,* 783 F.Supp. at 353. We agree.

In *Lyons,* the plaintiff sued the City of Los Angeles and several police officers, alleging that the officers had stopped him for a routine traffic violation and applied a chokehold without provocation. Among other things, the plaintiff requested an injunction against further use of the chokehold unless the suspect threatened deadly force. The Supreme Court held that Lyons lacked standing to seek such relief because he could not show a real or immediate threat of future harm. 461 U.S. at 105, 103 S.Ct. at 1667. In reaching that conclusion, the Court relied on its earlier decision in *O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974), where a class of plaintiffs had alleged discriminatory enforcement of the criminal laws. The *O'Shea* Court explained that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects." 414 U.S. at 495–96, 94 S.Ct. at 675–76. The Court found no case or controversy because "the threat to plaintiffs was not 'sufficiently real and immediate ... simply because [the plaintiffs] anticipate violating lawful criminal statutes and being tried for their offenses....'" Instead, "[i]t was to be assumed that '[plaintiffs] will conduct their activities within the law and so avoid prosecution and conviction as well as exposure to the challenged course of conduct said to be followed by petitioners.'" *Lyons,* 461 U.S. at 103, 103 S.Ct. at 1665 (quoting *O'Shea,* 414 U.S. at 496–97, 94 S.Ct. at 676).

Utilizing this reasoning, the *Lyons* Court explained that "Lyons' standing to seek the injunction requested depended on whether he was likely to suffer future injury from the use of the chokeholds by police officers." 461 U.S. at 105, 103 S.Ct. at 1667. The Court found the allegation of an earlier choking sufficient to confer standing for a damage claim, but it did

> nothing to establish a real and immediate threat that [Lyons] would again be stopped for a traffic violation, or for any other offense, by an officer or officers who would illegally choke him into unconsciousness without any provocation or resistance on his part. The additional allegation in the complaint that the police in Los Angeles routinely apply chokeholds in situations where they are not threatened by the use of deadly force falls far short of the allegations that would be necessary to establish a case or controversy between these parties.

*Id.*

*Lyons* and *O'Shea* are controlling here. Like the plaintiffs in those cases, Knox cannot establish a real and immediate threat that he again will be subject to use of the black box. Although Stateville uses the black box on all segregation prisoners, the mere possibility that Knox may sometime in the future be returned to the segregation unit does not establish a real and immediate case or controversy. Presumably, Knox would be returned to segregation only if he were to violate a prison rule, such as the one prohibiting the possession of dangerous contraband. Although that may be a very real possibility given that contraband was found in Knox' cell twice in four years, we must assume that Knox will abide by prison rules and thereby avoid a return to segregation status. *See O'Shea,* 414 U.S. at 496, 94 S.Ct.

at 676; *see also Nelsen v. King County*, 895 F.2d 1248, 1253 (9th Cir.1990); *Mann v. Hendrian*, 871 F.2d 51, 53 (7th Cir.1989).

Our discussion of *Lyons* is in accord with our earlier decision in *Robinson v. City of Chicago*, 868 F.2d 959 (7th Cir.1989), *cert. dismissed*, 493 U.S. 1012, 110 S.Ct. 708, 107 L.Ed.2d 729 (1989), *and cert. denied*, 493 U.S. 1035, 110 S.Ct. 756, 107 L.Ed.2d 773 (1990), where the plaintiffs had challenged two City of Chicago policies that authorized the pre-hearing detention of arrestees pending further criminal investigations or clearance of their fingerprints. We held that the plaintiffs lacked standing under *Lyons* because, assuming that their future conduct would not provide police with probable cause to arrest them, the plaintiffs could not expect a further encounter with the City's pre-hearing detention policies. Thus, "even if the police were to continue to detain others for investigation ..., the possibility that [the plaintiffs] would suffer any injury as a result of that practice is too speculative." *Id.* at 966. Similarly, although other segregation prisoners here are still subject to the black box restraint in accordance with prison policy, the possibility that Knox would again be subject to the black box is similarly speculative. *See Brown v. Fauver*, 819 F.2d 395, 400 (3d Cir.1987) (plaintiff lacked standing to obtain declaratory or injunctive relief against future application of state prison regulation in disciplinary proceedings because he failed to show a "real likelihood" or an "immediate threat" that he again would be the subject of a prison disciplinary hearing); *Martin v.*

*Sargent*, 780 F.2d 1334, 1337 (8th Cir.1985) (prisoner's claim for injunctive relief seeking improvement of prison conditions moot where prisoner had been moved to another prison unit; for the same reason, prisoner lacked standing to seek declaratory relief).

Knox argues that he nonetheless has standing because the prison policy here is one that is "capable of repetition, yet evading review." This principle operates to confer standing "where a claim is so transitory that a plaintiff may have standing when litigation begins but loses it—loses his personal stake—as the litigation continues." *Robinson*, 868 F.2d at 967; *see also Feit v. Ward*, 886 F.2d 848, 857 (7th Cir.1989). Knox argues that the black box policy will evade review because once a prisoner files a lawsuit challenging the policy, he will be returned to the general prison population, depriving him of the opportunity to seek injunctive relief. This assumes, of course, that prison officials will elevate legal maneuvering over the genuine concerns for prison security that presumably prompted an assignment to segregation. We need not comment on the likelihood of such maneuvering, however, because the "capable of repetition, yet evading review" doctrine applies only where repetition of the conduct " 'is likely to embroil the same parties to the dispute.' " *Robinson*, 868 F.2d at 967 (quoting *Holmes v. Fisher*, 854 F.2d 229, 232 (7th Cir.1988)). Because Knox cannot make a reasonable showing that "he will again be subject to the alleged illegality," the "capable of repetition" doctrine does not apply.[16] *Id.; see also Lyons*, 461 U.S. at 110,

---

16. The concurring opinion would find that Knox has standing to seek injunctive relief because his claim is "capable of repetition yet evading review." Our colleague distinguishes Knox' situation from that in *Lyons* because here it is undisputed that Knox will be forced to wear the black box if he is returned to the segregation unit, whereas in *Lyons*, "it would be highly unlikely that the police would 'again render [Lyons] unconscious without any provocation.' " (Concurrence at 1 (quoting *Lyons*, 461 U.S. at 105–06, 103 S.Ct. at 1667).) Yet that distinction still rests largely on the assumption that Knox would at some future point violate a prison rule and be assigned to segregation. Rather than permitting Knox to establish standing by suggesting that he again will violate a prison rule, however, we must assume lawful conduct on his part that would provide prison officials with no reason to

discipline him. *See Mann*, 871 F.2d at 53; *Robinson*, 868 F.2d at 966. Although the concurring opinion suggests that Knox' status is subject to the whim of prison officials, there is no indication that Knox has been disciplined for anything but valid rules violations.

We also find *Clark v. Brewer*, 776 F.2d 226, 229 (8th Cir.1985), relied on in the concurring opinion, distinguishable. There, the court found that the plaintiff's release from "close management" did not moot his challenge to that status because his claim was "capable of repetition yet evading review." The court found a reasonable expectation that Clark would return to "close management" because, after his return to the general prison population, Clark had been the subject of numerous disciplinary reports, resulting in his assignment to punitive segregation, a detention status even more severe than close management.

103 S.Ct. at 1669 ("the capable-of-repetition doctrine applies only in exceptional situations, and generally only where the named plaintiff can make a reasonable showing that he will again be subjected to the alleged illegality."); *Feit*, 886 F.2d at 857. Knox therefore lacks standing to pursue a claim for injunctive relief.

## III. CONCLUSION

For the foregoing reasons, defendants are entitled to qualified immunity from Knox' individual capacity claims for damages. Knox' official capacity damages claims are barred by the eleventh amendment. Finally, Knox lacks standing to seek an injunction against future use of the black box on segregation prisoners. The judgment of the district court is

AFFIRMED.

REYNOLDS, Senior District Judge, concurring.

I agree with the majority that we should affirm the district court's decision, but I think we should do so by reaching the merits of the underlying claim. Plaintiff-appellant Paul Knox was put in segregated confinement twice between 1986 at 1990 and remains under the total control of those who put him there. If put there again, he will automatically be placed in the black box whenever he leaves his cell. Periods of segregated confinement are relatively short in duration; Knox' most recent one began in March 1990, and ended in October 1990, about five months after this action was filed.

On these facts, I think it is safe to say that the challenged action in this case is "capable of repetition, yet evading review," and that therefore Knox' claim for injunctive relief is not moot. *Murphy v. Hunt*, 455 U.S. 478, 482, 102 S.Ct. 1181, 1183, 71 L.Ed.2d 353 (1982). *See Clark v. Brewer*, 776 F.2d 226, 229 (8th Cir.1985) (holding that prisoner's challenge to conditions of segregated confinement was not mooted by his release from it).

Upon his release from punitive segregation, however, Clark would be assigned to close management in accordance with a standard prison policy, making his return a "virtual certainty." *Id.* The same is not true here. Although Knox has

The instant case is quite unlike *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), where the plaintiff was held to lack standing to seek injunctive relief against a police department's use of the chokehold. That decision was based not on the assumption that the plaintiff would not be stopped by police in the future, but on the assumption that even if he were stopped, it would be highly unlikely that the police would "again render him unconscious without any provocation." *Lyons*, 461 U.S. at 105–06, 103 S.Ct. at 1667. In this case, by contrast, there is no question that Knox will be forced to wear the black box if he is segregated again. Further, as noted above, he remains under the complete control of those who decide whether to segregate him.

A review of the merits of Knox' claim is constrained by the district court's refusal to accept his late-filed summary judgment response, for I agree that the refusal was not an abuse of discretion. It follows, I think, that we must accept as undisputed the defendants-appellees' assertion below that the black box serves the legitimate penological purpose of preventing high-risk prisoners from tampering with their handcuffs while outside their cells. If we accept that assertion, then there seems to be no genuine issue of fact as to "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian*, —— U.S. ——, ——, 112 S.Ct. 995, 998, 117 L.Ed.2d 156 (1992).

Thus, I believe Knox' claim fails because he has not attempted to challenge defendants' assertion regarding the penological justification for the black box, not because he lacks standing.

been assigned to segregation twice in the last seven years, there is no reasonable expectation that he would return absent some further violation of prison rules.