**Mustafa AL–ALAMIN, Gerry Benin Fareed, and Abu Khalid Baseer, Plaintiffs–Appellees,**

v.

**Richard B. GRAMLEY, individually and in his official capacity as Warden of Dixon Correctional Center, Larry E. Sachs, individually and in his official capacity as Deputy Warden of Dixon Correctional Center, Jerry Porter, individually and in his official capacity as Chaplain of Dixon Correctional Center, Michael P. Lane, individually and in his official capacity as Director of Illinois Department of Corrections and Linda A. Giesen, Warden, Defendants–Appellants.**

No. 89–3381.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 6, 1990.

Decided March 6, 1991.

Lon Richey, Nelson, Kilgus, Richey & Tusek, Morrison, Ill., for plaintiffs-appellees.

Neil F. Hartigan, Atty. Gen., Gary M. Griffin, William D. Frazier, Asst. Attys. Gen., Chicago, Ill., Michael J. West, Asst. Atty. Gen., Springfield, Ill., Jennifer A. Keller, Asst. Atty. Gen., Civil Appeals Div., Chicago, Ill., for defendants-appellants.

Before WOOD, Jr., CUDAHY, and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

The plaintiffs, three Muslim inmates incarcerated at the Dixon Correctional Center (Dixon) in Dixon, Illinois, instituted this suit pursuant to 42 U.S.C. § 1983, against various officers at Dixon and state officials for alleged deprivations of their religious freedoms as guaranteed by the first amendment. The plaintiffs sought damages as well as declaratory and injunctive relief. After a bench trial, the district court awarded plaintiffs one dollar in damages and further ordered Michael P. Lane, the Director of the Illinois Department of Corrections, to submit to the court statewide written guidelines concerning the ac-

commodation of Muslim inmates desiring to practice their religion while incarcerated. The appellants filed a timely notice of appeal. For the following reasons, we reverse the judgment of the district court.

# I

## BACKGROUND

### A. *Facts*

Dixon is a medium-security prison within the Illinois Department of Corrections. At the time of trial, Dixon housed 890 inmates. Approximately twenty to thirty-five of those inmates adhered to the Muslim faith. The plaintiffs desired to practice certain tenets of the Muslim religion during their incarceration at Dixon. They believed that officers at Dixon and state officials (collectively the Dixon officials) failed to accommodate their religious practices. This litigation resulted. The plaintiffs alleged that the Dixon officials violated their first amendment rights by: (1) failing to provide a Muslim chaplain or imam to lead Jumah prayer services; (2) prohibiting an inmate to lead Jumah prayer under the supervision of a non-Muslim chaplain or correctional officer when an imam was unavailable; (3) failing to develop and promulgate reasonable policies and practices regarding Jumah prayer in the absence of a staff or volunteer imam; and (4) prohibiting Muslim inmates to purchase or receive, as a donation from the outside Muslim community, commercially packaged Halal foods for consumption during the fast of Ramadan and the feast of Eid–Ul–Fitr.

We shall describe, albeit in cursory fashion, the above Muslim practices. Jumah prayer is a Muslim service taking place every Friday. Orthodox Muslims gather together on this day, leaving all other business behind. During Jumah prayer, the Holy Quran, the Muslim religious scripture, is read. An imam, the individual responsible for leading prayer in the Muslim community, gives a Khutbah, which is a sermon interpreting Quranic verses. Prayer and meditation are also part of the service. Dixon conducted its first Jumah prayer service on October 18, 1985. Approximately twenty-five to thirty inmates attended the service. Because no imam was present to give the Khutbah, one of the plaintiffs functioned as the imam. The next Jumah prayer service was held the following Friday by a visiting imam. Because no Muslim inmate was permitted to act as imam, Jumah prayer services were then held sporadically. On March 1, 1988, the Illinois Department of Corrections entered into a contract with Imam Abdul–Alim Bashir. The contract compensated him for ministering to the Muslim inmates at Dixon for four hours a week. Imam Bashir lives in Chicago. He alternates between Fridays and Saturdays in going to Dixon each week.

Muslims have certain dietary requirements. Their Halal diet prohibits them from eating any pork, and the meat they do eat must be specially prepared. Dixon accommodates this diet by identifying food containing pork and providing a pork substitute for Muslim inmates.

Certain times of the year are of special religious significance to Muslims. In May and June, Muslims observe Ramadan. Ramadan is a sacred time for Muslims. From dawn to dusk during this sacred time, Muslims abstain from water, food, and sex. They read one-thirtieth of the Quran each day and recite extra prayers during this time. At the conclusion of Ramadan, a special feast, a festival of fast breaking, called the Eid–Ul–Fitr, occurs. During Ramadan, Dixon makes special arrangements to accommodate those inmates desiring to observe the fast. For example, during this time, Muslim inmates eat at approximately 4:00 a.m. and again at 8:30 p.m. Dixon provides prison personnel at those hours to escort the inmates to and from the dining room. Although members of a Muslim community outside the prison voluntarily prepared Halal food for the inmates on prior occasions, Dixon currently allows only commercially prepared and packaged Halal food in its facilities for security reasons.

On February 21, 1989, after a two-day bench trial, the district court awarded one dollar in damages to the plaintiffs and or-

dered Mr. Lane, the Director of the Illinois Department of Corrections, to submit to the court written guidelines concerning the accommodation of Muslim inmates desiring to practice their religion while incarcerated in the Illinois penal system. The Dixon officials moved to reconsider, alleging, *inter alia*, that Imam Bashir had been compensated for his travel expenses in his contract with the Illinois Department of Corrections and that qualified immunity shielded them from liability for damages. On September 29, 1989, the court denied the motion to reconsider. The Dixon officials now appeal.

## B. *District Court Opinion*

Acknowledging the Supreme Court's decision in *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), the district court framed the key inquiry as whether the Dixon officials unreasonably restrained the plaintiffs from practicing their religious beliefs. From this perspective, the court evaluated each of the plaintiffs' claims and determined the appropriate relief.

### 1. Muslim chaplain or imam

██ The court recognized that, as a general principle, a prison is not required to employ chaplains representing every faith among the inmate population. *See Cruz v. Beto*, 405 U.S. 319, 322 n. 2, 92 S.Ct. 1079, 1081 n. 2, 31 L.Ed.2d 263 (1972); *Johnson–Bey v. Lane*, 863 F.2d 1308, 1310 (7th Cir. 1988). Nevertheless, relying on this court's decision in *Johnson–Bey*,[1] the court commented that the hiring and compensating of full-time chaplains for Catholic and Protestant prisoners, and the concomitant failure to hire or adequately compensate full-time chaplains for Muslims inmates was troubling. *See* District Court's Order of Feb. 21, 1989 (R.60) at 7. In the district court's view, Imam Bashir was compensated inadequately. He was paid for only four hours per week to minister to the inmates at Dixon, and he was not reimbursed for his travel expenses. As a re-

sult, the Muslim inmates had fewer opportunities to observe Jumah prayer service. This treatment did not, held the district court, comport with the standards of *Turner*.[2] Consequently, the plaintiffs' first amendment rights were violated. *Id.* at 8. In its order denying the motion to reconsider, the court noted the Dixon officials' argument that visiting imams, including Imam Bashir, were compensated for traveling expenses in addition to their salary. Nevertheless, the court continued to maintain that the compensation was insufficient and resulted in fewer opportunities for the plaintiffs to observe Jumah prayer service. *See* District Court's Order of Sept. 29, 1989 (R.71) at 2.

### 2. Inmate-led religious services

The district court held that the policy of no inmate-led services was a legitimate regulation that did not infringe on plaintiffs' free exercise right. It noted that this court's decision in *Hadi v. Horn*, 830 F.2d 779, 784 (7th Cir.1987), upheld the same kind of policy based on legitimate security interests. Nevertheless, again relying upon *Turner*, the district court believed that allowing inmates to meet for prayer and worship without an imam present while under appropriate supervision was a satisfactory alternative that was currently available at Dixon. The district court acknowledged that this approach was not entirely satisfactory to the plaintiffs because of their belief that Jumah prayer could not take place without a Khutbah. It also noted that the rule against inmate-led prayer might have been formulated with maximum-security institutions in mind rather than medium-security institutions such as Dixon. Nevertheless, the district court believed that it owed deference to the judgment of correctional officials that only prayer sessions led by an imam or supervised by correctional officers were acceptable from a security point of view. *See* R.60 at 9.

---

**1.** The district court identified this case as *Morgan–Bey v. Lane* in its order.

**2.** These standards are discussed more fully *infra*, pp. 685–686.

### 3. Halal food

The district court observed that there was no disputed issue concerning Halal food. The plaintiffs had conceded the reasonableness of the Dixon officials' concerns over hidden contraband in non-commercially packaged foods. Moreover, the plaintiffs were willing to purchase commercially prepared and packaged food for Ramadan and the feast of Eid–Ul–Fitr. The court did indicate, however, that, if Dixon refused to permit the plaintiffs to purchase, at their own expense, commercially prepared Halal food, it could see no legitimate penological interest in such a refusal. *Id.* at 10.

### 4. Appropriate relief

Finally, the district court considered the appropriate relief for the deprivations of the plaintiffs' constitutional rights. The court recognized that qualified immunity would shield the Dixon officials from liability in their individual capacities if they did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Id.* at 10–11. But the court concluded that the plaintiffs' right to exercise their religious beliefs was sufficiently clear in light of prior precedent; thus, the Dixon officials could not advance the qualified immunity defense. Relying on *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978), the district court held that a section 1983 plaintiff was entitled to recover only nominal damages absent proof of actual injury. Finding that the plaintiffs had not presented any evidence of actual injury, the court awarded the plaintiffs damages of one dollar. *Id.* at 10–11. In its order denying the Dixon officials' motion to reconsider, the court affirmed its monetary damage award. It maintained its position that the plaintiffs' first amendment right was clearly established by prior case law. *See* R.71 at 6.

Concerning injunctive relief, the court concluded that "[t]he problems giving rise to the cause of action in this case are similar to problems arising all over the State of Illinois in its Department of Corrections facilities." R.60 at 12. The court believed that many problems, and accompanying lawsuits, could be averted by statewide written guidelines addressing the reasonable accommodation of Muslim inmates desiring to practice their religion while incarcerated. The court found such policies "either non-existent or vague and are arbitrarily enforced" in the Illinois penal system. *Id.* at 13. Accordingly, the district court ordered the Dixon officials to submit such guidelines to the district court within sixty days of the order. The guidelines had to comply with three specific goals identified by the court: (1) prison authorities must compensate a Muslim imam to conduct weekly Jumah prayer services; the compensation had to include traveling expenses and other expenses comparable to compensation paid chaplains of other faiths; (2) Muslim inmates must be permitted to meet for prayer and worship with appropriate supervision by the prison staff or by an imam; and (3) commercially prepared and packaged Halal food must be available to Muslim inmates during Ramadan and the feast of Eid–Ul–Fitr.

In denying the motion to reconsider, the court clarified this injunctive relief. The court indicated that Mr. Lane, as the Director of the Illinois Department of Corrections, was to prepare the guidelines because he possessed the requisite authority. *See* R.71 at 3. The court further articulated its rationale for ordering the injunctive relief. First, the guidelines would prevent "a multiplicity of lawsuits." *Id.* at 4. The court was concerned with movement of prisoners through the Illinois prison system and reasoned that a prisoner should not be required to institute a new law suit each time he was moved to a different correctional facility. Second, the written guidelines would facilitate consistency of treatment among prison inmates and more rapidly accommodate inmates' requests relating to their religious practices. *See id.* The court accepted the Dixon officials' argument that each correctional institution was a distinct entity, but could see no reason why the guidelines could not be crafted to recognize the uniqueness of each entity. *See id.*

## II

## ANALYSIS

### A. *Governing Principles*

#### 1. Injunctive relief

 The principles governing injunctive relief in a case such as this are well established. A federal court possesses broad powers to remedy constitutional violations, but these powers are not boundless. As an initial matter, the federal court must find that a constitutional violation exists. "[I]t is important to remember that judicial powers may be exercised only on the basis of a constitutional violation." *Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971). When there is no continuing violation of federal law, injunctive relief is not part of a federal court's remedial powers. *See Green v. Mansour*, 474 U.S. 64, 71, 106 S.Ct. 423, 427, 88 L.Ed.2d 371 (1985); *Watkins v. Blinzinger*, 789 F.2d 474, 484 (7th Cir.1986), *cert. denied*, 481 U.S. 1038, 107 S.Ct. 1976, 95 L.Ed.2d 816 (1987). But even when a violation is found, the power of a federal court to issue injunctive relief is circumscribed by the nature and extent of the constitutional violation. *See Dayton Bd. of Educ. v. Brinkman*, 433 U.S. 406, 419–20, 97 S.Ct. 2766, 2775, 53 L.Ed.2d 851 (1977); *Milliken v. Bradley*, 418 U.S. 717, 738, 744, 94 S.Ct. 3112, 3124, 3126, 41 L.Ed.2d 1069 (1974); *Swann*, 402 U.S. at 16, 91 S.Ct. at 1276; *United States v. Board of School Comm'rs*, 637 F.2d 1101, 1113–14 (7th Cir. 1980). " 'Once a constitutional violation is found, a federal court is required to tailor "the scope of the remedy" to fit "the nature and extent of the constitutional violation." ' " *Brinkman*, 433 U.S. at 420, 97 S.Ct. at 2775 (quoting *Hills v. Gautreaux*, 425 U.S. 284, 293–94, 96 S.Ct. 1538, 1544, 47 L.Ed.2d 792 (1976) (citations omitted) (quoting *Milliken*, 418 U.S. at 744, 94 S.Ct. at 3127)). Thus, we must review the court-ordered remedy in light of the constitutional violations found. In doing so, we realize that "[w]hile a remedy must be narrowly tailored, that requirement does not operate to remove all discretion from the District Court in its construction of a remedial decree." *United States v. Paradise*, 480 U.S. 149, 185, 107 S.Ct. 1053, 1073–74, 94 L.Ed.2d 203 (1987).

#### 2. Substantive law

Our review of the plaintiffs' first amendment claims is governed by the Supreme Court's decision in *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). In *Turner*, the Court explained that a prison regulation that impinges on inmates' constitutional rights is valid "if it is reasonably related to legitimate penological interests." *Id.* at 89, 107 S.Ct. at 2261. The Court identified several factors relevant to ascertaining the reasonableness of the prison's regulation. *Id.* at 89–90, 107 S.Ct. at 2261–62. On a prior occasion, this court has grouped these factors into a four-part test:

1. "whether a valid, rational connection exists between the regulation and a legitimate government interest behind the rule";

2. "whether there are alternative means of exercising the right in question that remain available to prisoners";

3. "the impact accommodation of the asserted constitutional right would have on guards and other inmates and on the allocation of prison resources"; and

4. "although the regulation need not satisfy a least restrictive alternative test, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable."

*Williams v. Lane*, 851 F.2d 867, 877 (7th Cir.1988), *cert. denied*, 488 U.S. 1047, 109 S.Ct. 879, 102 L.Ed.2d 1001 (1989); *see Hadi v. Horn*, 830 F.2d 779, 784 (7th Cir. 1987). The Court adopted a reasonableness standard, as opposed to heightened scrutiny, to permit prison administrators "to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration[,]" and thereby prevent unnecessary federal court involvement in the administration of prisons. *Turner*, 482 U.S. at 89, 107 S.Ct. at 2261; *see O'Lone v. Estate of Shabazz*, 482 U.S.

342, 349 & n. 2, 107 S.Ct. 2400, 2404 & n. 9, 96 L.Ed.2d 282 (1987).

■ Subsequent to *Turner*, the Supreme Court and this circuit have had occasion to consider the first amendment's guarantee of the free exercise of religion in the prison context.[3] Those cases clearly reaffirm that incarcerated persons retain a right to practice their religion to the extent that such practice is compatible with the legitimate penological demands of the state.[4] Both security and economic concerns are legitimate penological demands.[5] Prison administrators, like most government officials, have limited resources to provide the services they are called upon to administer.

■ Within these constraints, the prison must afford all inmates a reasonable opportunity to practice their religion. In providing this opportunity, the efforts of prison administrators, when assessed in their totality, must be evenhanded. Prisons cannot discriminate against a particular religion. *See Cruz v. Beto,* 405 U.S. 319, 322, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972); *Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1733, 1733, 12 L.Ed.2d 1030 (1964). The rights of inmates belonging to minority or non-traditional religions must be respected to the same degree as the rights of those belonging to larger and more traditional denominations. Of course, economic and, at times, security constraints may require that the needs of inmates adhering to one faith be accommodated differently from those adhering to another. Nevertheless, the treatment of all inmates must be qualitatively comparable.

### B. *Application of the Principles*

With these principles in mind, we now consider the district court's remedial decree. The district court's order was broad. Mr. Lane was required to develop *statewide* guidelines addressing the accommodation of Muslim inmates desiring to practice their religion while incarcerated at any correctional center in the state of Illinois. Moreover, the guidelines had to satisfy substantially three goals: (1) a Muslim imam was to be paid by the prison authorities to conduct weekly Jumah prayer services; the compensation had to include traveling expenses and other expenses "comparable" to that paid chaplains of other faiths; (2) Muslim inmates should be able to gather for prayer and worship with appropriate supervision by the prison staff or by an imam; and (3) commercially prepared and packaged Halal food was to be available to Muslim inmates during Ramadan and the feast of Eid–Ul–Fitr. *See* R.60 at 13.

With respect to the latter two goals, there appears to be no dispute that Dixon was in full compliance at the time of the entry of the district court's injunctive relief. The court held that Dixon's policy of no inmate-led services was "a legitimate regulation not infringing on Plaintiffs' First Amendment rights." R.60 at 9. Moreover, the court found that Muslim inmates at Dixon were allowed "to gather for prayer and worship without an Imam present when a staff supervisor is present to prevent any adverse effects." *Id.* As to Halal food, the court "fail[ed] to see a disputed issue." *Id.* at 10. The court did not find that commercially prepared and packaged Halal foods were prohibited at

---

**3.** *See, e.g., O'Lone; Young v. Lane,* 922 F.2d 370 (7th Cir.1991); *Al–Amin Hunafa v. Murphy,* 907 F.2d 46 (7th Cir.1990); *Johnson–Bey v. Lane,* 863 F.2d 1308 (7th Cir.1988); *Williams v. Lane,* 851 F.2d 867 (7th Cir.1988); *Reed v. Faulkner,* 842 F.2d 960 (7th Cir.1988); *Hadi v. Horn,* 830 F.2d 779 (7th Cir.1987).

**4.** *See, e.g., O'Lone,* 482 U.S. at 348, 351–52, 107 S.Ct. at 2405–06 (prison regulation impinging on Muslim inmates' ability to attend Jumah valid because of legitimate security concerns); *Johnson–Bey,* 863 F.2d at 1311 (prison's refusal to permit Moorish inmates to conduct their own

religious services upheld because of security concerns).

**5.** For example, in *Turner,* one factor under the four-factor approach is the impact the constitutional right will have on the allocation of prison resources. 482 U.S. at 90, 107 S.Ct. at 2262. And security concerns are naturally a legitimate penological interest. *See O'Lone,* 482 U.S. at 348, 353, 107 S.Ct. at 2404, 2406; *Johnson–Bey,* 863 F.2d at 1311. Chief Justice Rehnquist identified crime deterrence and prisoner rehabilitation as other valid penological objectives. *See O'Lone,* 482 U.S. at 348, 107 S.Ct. at 2404.

Dixon; rather it simply observed that, if the Dixon officials prevented the plaintiffs from purchasing such food, there would be no legitimate penological interest for that action. At trial, Imam Bashir testified that Halal food was provided for the Muslim inmates through the commissary and that Dixon had contracted with outside parties to have Halal meats available. *See* Tr. II at 148. The district court was entitled to credit that testimony.

The remaining item concerns compensation for visiting imams. To the extent that the district court's order is based on the matter of travel funds, it appears that the court was under a misapprehension. It is clear from the record that Imam Bashir and other visiting imams were compensated for travel expenses. Gary Greer, a former chaplain at Dixon, testified that visiting Muslim imams were paid mileage and tolls. Imam Bashir also testified that he was reimbursed for mileage and tolls, in addition to his contract salary. When the Dixon officials requested the court to reconsider its order in light of this evidence, the court summarily reaffirmed its order and, without tendering an alternative reason, said, "the compensation paid to the Muslim Imam was insufficient. The result was fewer opportunities for Plaintiffs to observe Jumah prayer services." R.71 at 2.

■ While it is not entirely clear, the district court may also have believed that the expenditure to compensate the visiting imam was inadequate. In this regard, we believe the district court misapprehended both the factual record and the applicable legal standard. By its decree, the court required that travel and other compensation paid to visiting imams be "comparable to that paid to chaplains of other faiths." Dixon employs a full-time *staff* chaplain who services the *entire* inmate population.[6] The law clearly does not mandate Dixon to pay for a full-time imam. *See Cruz*, 405 U.S. at 322 & n. 2, 92 S.Ct. at 1081 & n. 2;

*Young*, 922 F.2d at 377–78; *Johnson–Bey*, 863 F.2d at 1312. Dixon need make only reasonable efforts to afford the inmates an opportunity to practice their faith. *See Cruz*, 405 U.S. at 322 & n. 2, 92 S.Ct. at 1081 & n. 2.

■ Contrary to the district court's conclusion, the record reveals that the compensation paid Imam Bashir provided the plaintiffs with a reasonable opportunity to practice their Muslim religion. Dixon paid Imam Bashir seventy-five dollars for four hours of service each week, in addition to mileage and tolls. *See* Appellants' App. at 28 (contract). There was no evidence on how long the services he performs last, but at trial he testified that, before he had a contract with Dixon, typically his visits would last approximately two hours. Imam Bashir alternates his weekly visits between Fridays and Saturdays. On Friday he leads Jumah and on Saturday he leads Taleem, another type of prayer service. Imam Bashir also testified that he would come to Dixon every Friday and Saturday if he were compensated. However, the fact that the plaintiffs could have enjoyed additional religious services if Dixon would have increased Imam Bashir's compensation does not render his compensation insufficient nor does it necessarily render the institution's efforts to accommodate the needs of its Muslim prisoners constitutionally insufficient. We note that Imam Bashir testified that, when he is not present at Dixon, two volunteers—Imam Alauddin Shabazz and Jemal Saleh—service the Muslim inmates at Dixon. Indeed, Imam Bashir testified that he made specific arrangements with Jemal so that "[w]hen I'm not in, he can come in." Tr. II at 146.

We believe Dixon has provided a reasonable opportunity for Muslim inmates to participate in Jumah, the keystone of their faith, on a consistent basis. Moreover, Halal food is available to the Muslim inmates, a full-time chaplain ministers to all religious groups, Imam Bashir is compensated

---

**6.** In *Johnson–Bey* the court stated that the establishment clause is not violated when a prison employs a chaplain. This practice "seem[s] consistent with, and indeed required by, the overall purpose of the First Amendment's religious clause." 863 F.2d at 1312. Hiring a full-time chaplain to minister to the religious needs of the entire inmate population, and paying traveling expenses for volunteer or part-time ministers of specific sects, are distinct components of a penal institution's effort to accommodate the religious needs of its inmates.

for specifically ministering to the Muslim inmates for four hours a week, and volunteers provide additional religious leadership when Imam Bashir is not available. Indeed, at the time of trial, the only minister other than the chaplain to receive pay was Imam Bashir.

We also note that, on appeal, there are no allegations that, taken in its totality, treatment of Muslim prisoners with respect to their religious needs was any less favorable than that of any other prisoner at Dixon.[7] In our view, the record establishes that the Dixon officials have satisfied their constitutional responsibility and made reasonable efforts to afford the plaintiffs an opportunity to practice their religion. This conclusion is supported by the Supreme Court's decision in *O'Lone*. There, several Muslim inmates challenged, on first amendment grounds, a prison policy that required inmates in their classification to work outside and, as a result, miss weekly Jumah services. *See* 482 U.S. at 345, 107 S.Ct. at 2402. The Court upheld the policy as reasonable under *Turner* because the inmates were "not deprived of all forms of religious exercise, but instead freely observe[ed] a number of their religious obligations." 482 U.S. at 352, 107 S.Ct. at 2406. Like the plaintiffs in this case, the *O'Lone* inmates could congregate as a group or with an imam for prayer or discussion, the prison made accommodations for their dietary requirements, and special arrangements were made for the observance of Ramadan. *Id.* Moreover, unlike the *O'Lone* inmates, the plaintiffs have reasonable opportunities to participate in Jumah. Clearly, the plaintiffs' basic religious services and dietary needs were provided.

█ In the absence of an ongoing constitutional violation, there was no ground that would justify the entry of any injunctive relief against the Dixon officials. *See Green v. Mansour*, 474 U.S. 64, 71, 106 S.Ct. 423, 427, 88 L.Ed.2d 371 (1985); *Watkins v. Blinzinger*, 789 F.2d 474, 484 (7th Cir.1986), *cert. denied*, 481 U.S. 1038, 107 S.Ct. 1976, 95 L.Ed.2d 816 (1987). There-

fore, there certainly was no justification for the entry of injunctive relief that transcended even the constitutional violations found—albeit erroneously—by the district court. While statewide regulations governing the accommodation of religious needs of prisoners may be a preferable approach, it is not the prerogative of the federal courts to micromanage the penal system of a state. As Justice O'Connor wrote in *Turner*:

> Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint. Where a state penal system is involved, federal courts have ... additional reason to accord deference to the appropriate prison authorities.

*Turner*, 482 U.S. at 84–85, 107 S.Ct. at 2259. Nor, on this record, could a statewide remedy be justified on the ground that, in order to avoid the reach of the court's remedy, state authorities had shuttled prisoners to other locations where they would have to resort to the legal process anew in order to protect their right to practice their religion.

█ Nor do we believe that, on this record, a damage award can be justified. As we have noted in the proceeding paragraphs, at the time the district court entered its judgment, there was no ongoing constitutional violation. Therefore, damages based on the activities of the defendants at that time certainly would be inappropriate. The record does indicate that, at an earlier time, the opportunities for Muslim inmates to practice their religion were not as great. For instance, there was a period of time, before Imam Bashir began regular visits and after authorities forbade inmate-led services, when Jumah was held "sporadically." The record is not clear,

---

7. *Cf. Thompson v. Kentucky*, 712 F.2d 1078, 1079–80 (6th Cir.1983) (inmate's free exercise right was not violated when Muslim inmates were allowed 6.5 hours of chapel time per week and Christian groups were allowed 23.5 hours and when the state had hired two full-time and one half-time Christian chaplains and no Muslim chaplain).

and the district court made no explicit findings, with respect to the Muslim inmates' dietary needs for *special* feasts at an earlier period—other than the forbidding of non-commercially prepared food on security grounds, a precaution all parties agree is reasonable. The Muslim inmates' regular dietary regime was, as far as this record shows, accommodated.

We cannot say, on this record, that the activities of the defendants were, at any particular earlier point in time, constitutionally deficient. More fundamentally, we cannot say that the defendants' activity, much of which preceded the Supreme Court's decision in *Turner*, violated constitutional principles well-established at the time. In reaching this determination, we must keep in mind that the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).

### Conclusion

For the foregoing reasons, we must reverse the judgment of the district court.

REVERSED.