46 F.3d 1133
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Larry BRYANT-EL and Henry Hinton-Bey, Plaintiffs-Appellants,
v.
Daniel BOSSE, Warden, Daria M. Smith, Assistant Warden, and
Henry Johnson, Senior Chaplain, Defendants-Appellees.
 No. 93-1176.
 United States Court of Appeals, Seventh Circuit.
 Submitted: Jan. 5, 1995.*
Decided: Jan. 26, 1995.
 
 Before BAUER, RIPPLE and ROVNER, Circuit Judges.
 
 ORDER
 
 1
 Plaintiffs Larry Bryant-El and Henry Hinton-Bey, inmates in an Illinois state prison, brought this pro se civil rights action under 42 U.S.C. Sec. 1983 against officers of the prison who allegedly infringed plaintiffs' First Amendment right to practice their religion, which is a black Islamic sect known as the Moorish Science Temple of America ("MSTA"). Specifically, plaintiffs sought permission to hold weekly religious services and Sunday School under the supervision of a prison staff member, correctional officer, or chaplain. The district court granted summary judgment as a matter of law in favor of defendants, and dismissed the suit. The principal issue before us is whether defendants' refusal to allow plaintiffs to attend religious services under the supervision of staff or correctional officers is reasonably related to legitimate penological objectives of the state. Because this issue was not addressed by the district court, nor could it have been on the basis of the present record, we believe that summary judgment was not appropriate.
 
 BACKGROUND
 
 2
 Bryant-El and Hinton-Bey are state prisoners at the Logan Correctional Center. Defendants Daniel Bosse and Daria McCarthy-Smith are the prison's warden and assistant warden, respectively. Defendant Henry Johnson is a chaplain at the prison.
 
 
 3
 Plaintiffs belong to MSTA. Adherents of that faith have their own version of the Koran, and a group of prophets that includes Jesus, Mohammed, Buddha, and Confucius. Brother R. Love-El holds the title of Grand Sheik and is the recognized leader of the religion. Inmates belonging to MSTA represent less than 1% of the entire population at Logan.
 
 
 4
 At Logan, the assistant warden and the senior chaplain make continuous assessments to determine whether there is a need to hire clergy, secure facilities, or obtain funding for the inmates' various religious services. The employment of clergy persons of the various religious denominations is related to the percentage of the inmate population identifying themselves as members of a particular faith. If it is not economically feasible to employ a clergy person, Logan seeks out volunteer clergy to assist the institutional staff.
 
 
 5
 When Hinton-Bey entered Logan in 1989 and Bryant-El arrived in 1990, they learned that Logan had no established religious program for MSTA. Chaplain Johnson told Hinton-Bey that there were no weekly services for inmates belonging to MSTA. Chaplain Johnson declined to lead such services himself because he belonged to the Christian faith and had no knowledge of MSTA.
 
 
 6
 Because of the limited number of inmates belonging to MSTA, the institution has sought the volunteer assistance of an authenticated representative from the surrounding community to lead MSTA religious services. However, the facility has not totally succeeded in maintaining volunteer clergy for this group of inmates. For instance, in 1988, prison officials located a volunteer minister who agreed to conduct services for the MSTA inmates. However, that volunteer's participation became "sporadic" as other commitments began to interfere with his prison calls. A second volunteer was found in 1991; however, his visits were discontinued after two months when a routine background check revealed past and recent criminal history. Logan has been unable to find another suitable volunteer in the area who would be willing to conduct MSTA services for the inmates.
 
 
 7
 According to institutional policy, inmates are not allowed to conduct religious services on their own, without a staff member or volunteer clergy person present. Chaplain Johnson, a Christian, cannot or will not oversee religious services for MSTA inmates. Nevertheless, MSTA inmates are allowed to attend Muslim Imam services (which defendants admit differ to some degree from MSTA services), and prison records reflect that at least some MSTA inmates do in fact participate in Imam services. In addition, inmates have access to religious publications; are allowed to adhere to the dietary restrictions of their particular faith; and are permitted to worship, pray and/or study independently of scheduled activities. Religious activities are barred only if they are determined to jeopardize the security of the administration.
 
 
 8
 In May 1992, plaintiffs filed their complaint under 42 U.S.C. Sec. 1983, alleging a denial of their freedom of religious exercise. As relief, they requested weekly religious services and Sunday School supervised by a prison staff member, correctional officer, or chaplain, and also compensatory damages in the amount of $2.5 million. In November 1992, defendants moved for summary judgment on the basis of this court's decision in Hadi v. Horn, 830 F.2d 779 (7th Cir. 1987). Plaintiffs filed an opposition memorandum in which they urged the court to consider whether the prison's restrictions on their First Amendment rights were "necessary to carry out the legitimate goals of the correctional system." (Plaintiff's [sic] Motion in Opposition of Defendant's [sic] Motion for Summary Judgment, at 3.)
 
 
 9
 In December 1992, the district court granted summary judgment in favor of defendants, holding that no reasonable person could find that defendants violated plaintiffs' constitutional rights. The court found that defendants had established that they made good faith efforts to accommodate plaintiffs' religious needs, balancing plaintiffs' interests against prison budgetary concerns and the general lack of demand for MSTA activities.
 
 
 10
 Plaintiffs appealed.
 
 DISCUSSION
 
 11
 We review the district court's grant of summary judgment de novo, construing the evidence in the light most favorable to Bryant-El and Hinton-Bey and according them the benefit of all reasonable inferences. Cliff v. Board of Sch. Comm'rs, No. 93-2498, slip op. at 7 (7th Cir. Dec. 9, 1994). We will also construe the allegations in plaintiffs' pro se pleadings liberally. Kincaid v. Vail, 969 F.2d 594, 498 (7th Cir. 1992), cert. denied, 113 S. Ct. 1002 (1993). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Wallace v. Tilley, No. 94-1914, slip op. at 4 (7th Cir. Nov. 28, 1994).
 
 
 12
 On appeal, plaintiffs contend that the district court failed to address their claim that they should be allowed to have their religious services overseen by a chaplain on staff, a staff member, or a correctional officer. The presence of a correctional officer or staff member at an inmate-led service, plaintiffs seem to suggest, removes the possibility of any security threat or risk.
 
 
 13
 A prisoner is entitled to practice his or her religion as long as doing so does not unduly burden the institution. Richards v. White, 957 F.2d 471, 474 (7th Cir. 1992). A prison regulation that infringes upon an inmate's First Amendment rights is valid only "'if it is reasonably related to legitimate penological interests."' Alston v. DeBruyn, 13 F.3d 1036, 1039 (7th Cir. 1994) (quoting Turner v. Safley, 482 U.S. 78, 89 (1987)). This court has identified several factors which can be used in applying the "reasonableness" standard:
 
 
 14
 1. "whether a valid, rational connection exists between the regulation and a legitimate government interest behind the rule";
 
 
 15
 2. "whether there are alternative means of exercising the right in question that remain available to prisoners";
 
 
 16
 3. "the impact accommodation of the asserted constitutional right would have on guards and other inmates and on the allocation of prison resources; and
 
 
 17
 4. "although the regulation need not satisfy a least restrictive alternative test, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable."
 
 
 18
 Al-Alamin v. Gramley, 926 F.2d 680, 685 (7th Cir. 1991) (quoting Williams v. Lane, 851 F.2d 867, 877 (7th Cir. 1988)) (additional quotation marks omitted). Since Turner, this circuit has repeatedly reaffirmed the right of prisoners "to practice their religion to the extent that such practice is compatible with the legitimate penological demands of the state." Id. at 686 (citing cases).
 
 
 19
 Plaintiffs challenge not a prison regulation, but rather the denial of their request to attend religious services supervised by a chaplain, correctional officer, or staff member. Therefore, in deciding whether the prison's response was reasonable, we must focus attention on the specific kind of relief plaintiffs were requesting. The record shows that in May 1991, Bryant-El filed a grievance, complaining that the MSTA was the only religion at Logan that did not have religious services or Sunday School. Bryant-El requested that MSTA members be allowed to attend weekly services in the presence of one of the chaplains. The grievance officer noted in her report that Chaplain Johnson responded that because he was a Christian, he could not oversee services of which he had little or no knowledge. Concluding that the grievance had "no substance," the officer explained: "It would be the inmates not himself that would be running the service. Departmental procedures have therefore required that an outside faith representative has to be present." The record also contains copies of letters that were sent by MSTA members at Logan to the deputy director at the Illinois Department of Corrections, complaining that their requests to secure a place to conduct religious services had repeatedly been denied because of the requirement that an "outside faith representative" oversee the services. The letters also mentioned that MSTA services were in fact taking place under the supervision of chaplains or correctional officers in state correctional facilities at Stateville, Pontiac, Western, Lincoln, Galesburg, Shawnee, and Graham.
 
 
 20
 Unfortunately, the district judge failed to address in his order the reasonableness of the prison's refusal to allow MSTA members to conduct religious services under the supervision of staff, chaplains, or correctional officers. The court's order refers to defendants' budgetary constraints, the lack of demand for MSTA activities, and efforts to seek volunteer clergy; nowhere, however, does it mention any security concerns to justify the prison's refusal to accommodate plaintiffs' request. See Al-Alamin, 926 F.2d at 686 (characterizing security concerns as a legitimate penological demand of the state). Without first assessing whether the prison's response to plaintiffs' request bore a reasonable relationship to the legitimate penological goals of the state, the district judge could not have fairly concluded that plaintiffs' First Amendment rights were not violated.
 
 
 21
 Based on the present record, we are not persuaded that a valid, rational connection did exist between the prison's response and a legitimate government interest. Such a rational connection - for example, the state's interest in maintaining prison security - may in fact exist, but it is not reflected anywhere in the record. Warden Bosse asserted in his affidavit that "it is the institutional policy that inmates are not allowed to conduct or hold religious services on their own." The warden, however, offered no justification for this policy, nor did he suggest why inmates could not hold religious services under the supervision of staff or correctional personnel.
 
 
 22
 In Hadi v. Horn, 830 F.2d 779 (7th Cir. 1987), this court acknowledged that security concerns may govern the situation in which religious services are supervised by staff or chaplains of a denomination other than that of the inmates. In Hadi, Muslim inmates brought a civil rights action against prison administrators who allegedly interfered with the inmates' right to exercise their religious beliefs. The inmates charged that the prison improperly canceled services when a Muslim chaplain was unable to attend rather than allowing an inmate to conduct services under the supervision of a non-Muslim chaplain. The district court agreed with the prison that cancellation of services (in the event that a chaplain were unavailable to supervise) furthered the institution's security interests. On appeal, the inmates suggested, as a less restrictive alternative, that services be conducted under the supervision of a chaplain of any denomination. We rejected this suggestion because it did not fully address the prison's security concern that violent doctrinal disputes might break out when a supervisory staff member or chaplain of another denomination lacks knowledge about the inmates' religion. We observed, "A Muslim chaplain is in a better position to resolve doctrinal disputes that might arise at a[n Islamic] service than is a chaplain of another denomination with only limited exposure to the tenets of Islam." Id. at 787.
 
 
 23
 Although the factual scenario of Hadi resembles this case, we note that Hadi involved a bench trial.[1] Based on the evidence before it, the trial court in Hadi was able to consider whether the prison regulation had a valid connection to a legitimate government interest (even though the trial court did not have the benefit of Turner v. Safley). Furthermore, the trial court made a specific factual finding that cancellation of services furthered the interest of security at the prison. In contrast, the record before us contains no evidence to justify the prison's denial of plaintiffs' request to attend religious services under appropriate supervision. Absent such evidence, neither the district court nor this court is capable of assessing the reasonableness of the prison's rejection of plaintiffs' request.
 
 
 24
 We remand this case for a further determination of whether the prison's refusal to allow plaintiffs to attend religious services under the supervision of staff or correctional officers is reasonably related to a legitimate penological objective of the state.[2] Because defendants may decide to file more complete affidavits or other evidence, we do not rule out the possibility that defendants may yet prevail on a subsequent motion for summary judgment, grounded in a more complete factual record.
 
 
 25
 REVERSED and REMANDED.
 
 
 
 *
 After preliminary examination of the briefs, the court notified the parties that it had tentatively concluded that oral argument would not be helpful to the court in this case. The notice provided that any party might file a "Statement as to Need of Oral Argument." See Fed. R. App. P. 34(a); Cir. R. 34(f). No such statement having been filed, the appeal is submitted on the briefs and the record
 
 
 [1]
 Correctional centers in Illinois apparently do not have a uniform policy regarding the form of supervision needed for inmate religious services. In another Sec. 1983 action for deprivation of religious freedoms brought by a prisoner at the Dixon Correctional Center, we observed that "Muslim inmates at Dixon were allowed 'to gather for prayer and worship without an Imam present when a staff supervisor is present to prevent any adverse effects."' Al-Alamin v. Gramley, 926 F.2d at 686 (quoting record)
 
 
 [2]
 Plaintiffs also suggest on appeal that Judge Mills disregarded their contention that defendants violated their equal protection rights by denying them the same opportunities to attend religious services that are afforded other inmates of other religious denominations throughout the state prison system. At this stage of the proceedings, we believe that it is better to wait and allow a more complete record to be compiled before addressing the merits of plaintiffs' equal protection claim