Charles **MERRIWEATHER**, et al., Plaintiff,

v.

Wilbur K. **SHERWOOD**, et al., Defendant.

No. 77 CIV. 3421(CM).

United States District Court, S.D. New York.

Dec. 19, 2002.

MEMORANDUM DECISION AND OR-
DER DENYING APPLICATION
FOR POSTPONEMENT OF AUTO-
MATIC STAY

McMAHON, District Judge.

On or about November 4, 2002, defendants in this action moved under the Prison Litigation Reform Act ("PLRA") to dissolve a consent decree concerning conditions at the Orange County Correctional Facility ("OCCF"). *See* 18 U.S.C. § 3626(b)(2). The decree was entered some twenty-four years ago by The Hon. Edward Weinfeld of this, Court. Defendants contend that the consent judgement involves the Court as a permanent judicial overseer of almost every aspect of life at the prison, which is contrary to the purpose of the PLRA.

Under the PLRA, a motion to dissolve a consent decree operates as an automatic stay after thirty days, a date that a court can postpone for up to ninety days if a plaintiff demonstrates good cause. On or about November 15, 2002, plaintiffs moved, by notice of motion, to postpone the automatic stay. Plaintiffs also sought discovery from defendants. The Court received a response to the motion on December 4. The papers were dated December 3. At no time did plaintiffs contact the Court to request expedited treatment. They did not move for a postponement by order to show cause. They did not indicate on the face of the motion papers that they were requesting expedited treatment. They did not seek an order directing an expedited response from defendant. Therefore, chamber staff had no idea that the motion should be heard out of turn; it was simply placed in the queue, where I found it on December 10. It was addressed immediately thereafter.

For the following reasons, I find that the automatic stay went into effect on December 4, thirty days after defendants filed their motion to dissolve the consent decree, and I do not now have the authority to grant plaintiffs' motion for a sixty-day postponement. If I did, I would deny the application.

I. *This Court Does Not Have the Authority under the PLRA to Grant Plaintiffs' Motion to Postpone the Automatic Stay*

A. *The Statute*

The PLRA became effective on April 26, 1996. With respect to judgments entered prior to that date, the statute provides that

[A] defendant or intervener shall be entitled to the immediate termination of any prospective relief if the relief was approved or granted in the absence of a finding by the court that the relief is narrowly drawn, extends no further than necessary to correct the violation of the federal right, and is the least intrusive means necessary to correct the violation of the federal right.

18 U.S.C. § 3626(b)(2). Consent decrees constitute "prospective relief" under the PLRA. *See Benjamin v. Jacobson*, 172 F.3d 144, 156 (2d Cir.1999) ("[A] consent decree, to the extent that it awards a remedy other than compensatory monetary damages, constitutes prospective relief within the meaning of the Act."). Defendants therefore acted within their rights under the PLRA when they moved on November 4 to terminate the consent decree based on their contentions that (1) the court did not make the necessary findings, and (2) plaintiffs have never proven a violation of any federal right.

■ Pursuant to the PLRA, "[a]ny motion to modify or terminate prospective relief ... shall operate as a stay during the period beginning on the 30th day after such motion is filed." 18 U.S.C. § 3626(e)(2)(A)(i). The statute allows a court to "postpone the effective date of [such] an automatic stay ... for not more than 60 days for good cause." *Id.* at § 3626(e)(3). But a court may not postpone an automatic stay "because of general congestion of the court's calendar." *Id.*

The question is thus whether or not the PLRA affords me the discretion to consider plaintiffs' motion to postpone the automatic stay for sixty days even though the thirty-day period has expired. In order to answer this question, I turn to the language of the statute, as well as controlling judicial interpretations.

First, the statute states that defendants' motion to terminate the consent decree "*shall* operate as a stay" beginning on the 30th day after they filed the motion—i.e., December 4. 18 U.S.C. § 3626(e)(2)(A)(i) (emphasis added). The provision that allows a court to postpone the automatic stay for 60 days does not contravene this mandatory language. That portion of the statute states that a court "may *postpone* the effective date of an automatic stay." *Id.* at § 3626(e)(3) (emphasis added). According to the dictionary, to "postpone" means "[t]o put off until a future time." *Webster's II New Riverside University Dictionary* 919 (1984). It is implicit in this definition that one can only postpone something that has not yet occurred. If a wedding occurs on September 2, one cannot "postpone" the wedding until September 30 on September 5.

Thus, the only way this court could postpone the automatic stay is if plaintiffs' November 15 motion somehow suspended the stay's effect. A motion to postpone an automatic stay for good cause would then function as a de facto "stay of the stay" pending either a court's decision as to whether good cause exists or the termination of the maximum 90–day period. But the PLRA precludes this interpretation of the statute, because it states that "*a court* may postpone the effective date of an automatic stay." *Id.* at § 3626(e)(2)(A)(i) (emphasis added). It does not provide that the making of a motion postpones the stay without need for court action.

The Supreme Court's decision in *Miller v. French,* 530 U.S. 327, 120 S.Ct. 2246, 147 L.Ed.2d 326 (2000) is consistent with—indeed, bolsters—this interpretation of the statute. In *Miller,* the Court addressed whether the PLRA precludes courts from exercising their equitable powers to enjoin an automatic stay. The Court explained:

> Section 3626(e)(2) states that a motion to terminate prospective relief "*shall operate* as a stay *during*" the specified time period from 30 (or 90) days after the filing of the § 3626(b) motion *until* the court rules on that motion. Thus, not only does the statute employ the mandatory "shall," but it also specifies the points at which the operation of the stay is to begin and end. . . . To allow courts to exercise their equitable discretion to prevent the stay from operating during this statutorily prescribed period would be to contradict § 3626(e)(2)'s plain terms. It would mean that the motion to terminate merely *may* operate as a stay, despite the statute's command that it "shall" have such effect.

*Id.* at 337–38, 120 S.Ct. 2246.

In sum, I find that the PLRA establishes mandatory points at which the operation of the stay is to begin and end. A court may defer the start date of the stay for sixty days prospectively—i.e., before the 30–day period expires. The expiration of thirty days without a court order ex-

tending the stay means that the stay goes into effect. It can only be revoked by a final decision on the underlying motion to terminate.

### B. *Due Process*

In interpreting the PLRA as I do, I am well aware that this Court should construe statutes consistently with the Constitution, if the language will bear any such construction. *See N.L.R.B. v. Catholic Bishop of Chicago,* 440 U.S. 490, 500, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979). In *Miller,* the Court left open the question whether the 30 (or 90) day time limit for a court to consider a motion to terminate prospective relief before which an automatic stay will issue "may implicate due process concerns," especially "in a complex case." 530 U.S. at 350, 120 S.Ct. 2246. Those concerns are not present in this case, however, and therefore do not warrant a digression from a plain reading of the statute's language.

■ The issue of what process an individual is due only arises after a deprivation of certain substantive rights—life, liberty, or property. *See Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 541, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). A legal cause of action constitutes a "species of property protected by the Fourteenth Amendment's Due Process Clause." *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 428, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982). And the PLRA provides that

> Prospective relief shall not terminate if the court makes written findings based on the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation.

18 U.S.C. § 3626(b)(3). Thus plaintiffs are due a certain amount of process with respect to the final determination as to whether or not the consent decree must be terminated. They will be afforded that due process as this litigation moves forward. A stay of the consent decree, however, does not violate plaintiffs' due process rights for three reasons.

■ First, the consent decree at issue here does not in itself create a substantive right. That is because "modifiable decrees cannot create vested rights." *Inmates of Suffolk County Jail v. Rouse,* 129 F.3d 649, 658 (1st Cir.1997). In other words, "the provisions of a consent decree that order prospective relief remain subject to modification or alteration for changes in law or circumstances. Such right as a litigant may have to prospective relief is thus neither final nor 'vested' in the constitutional sense." *Benjamin v. Jacobson,* 172 F.3d at 164; *see also Plyler v. Moore,* 100 F.3d 365, 374–75 (4th Cir.1996); *Imprisoned Citizens Union v. Shapp,* 11 F.Supp.2d 586, 600–01 (E.D.Pa.1998).

■ Second, the provision allowing for a postponement of the stay does not create a due process right. That is because the procedures available for pursuing a legal cause of action do not create property interests in themselves. *See New York State Nat. Organization for Women v. Pataki,* 261 F.3d 156, 163–64 (2d Cir.2001); *Polk v. Kramarsky,* 711 F.2d 505, 508–09 (2d Cir.1983). This conclusion follows from the fact that "procedural due process protects only important and substantial expectations in life, liberty, and property." *New York State Nat. Organization for Women v. Pataki,* 261 F.3d at 164. Here, the only substantive expectation that warrants constitutional recognition is the entitlement under the PLRA that "a defendant or intervener shall be entitled to the

immediate termination of any prospective relief" if the court did not make the necessary findings, and that "[p]rospective relief shall not terminate" if the court makes such findings. 18 U.S.C. §§ 3626(b)(2) & (3). Plaintiffs do not have a substantive right to a sixty-day postponement of the automatic stay, which is part of the procedural framework that forwards the entitlements the PLRA establishes. That is because a "court *may* postpone the effective date of an automatic stay." 18 U.S.C. §§ 3626(e)(3) (emphasis added). And "[d]iscretionary statutes do not give rise to constitutionally protectable interests." *Baldwin v. Daniels,* 250 F.3d 943, 946 (5th Cir.2001), *quoted in New York State Nat. Org. for Women v. Pataki,* 261 F.3d at 164.

Third, even if the postponement provision were to trigger the Due Process Clause, plaintiffs have been afforded the process they are due. As Judge Easterbrook explained in his dissent to the Seventh Circuit's decision in *French v. Duckworth,* 178 F.3d 437 (7th Cir.1999)—which the Supreme Court overturned in *Miller v. French*—"Section 3626(e)(2) is not problematic under the due process clause. A stay is not a final decision (it is more like a TRO, which may issue *ex parte* ), and 30 days is adequate for the litigants to be heard (just as the 20–day window under Rule 65 affords time for a hearing)." *Id.* at 449 (Easterbrook, J., dissenting).

II. *Assuming Arguendo That The Court Still Has the Power to Decide the Motion to Postpone the Stay, It Is Denied*

Notwithstanding the above analysis, the Court has carefully reviewed the papers filed in support of and in opposition to the postponement of the automatic stay. Assuming arguendo that I had the power to decide the motion, I would deny it.

The purpose of the postponement provision is to provide plaintiffs with "an opportunity to present evidence showing the need for continuation of prospective relief pending a decision on the motion to terminate the consent judgment." *Benjamin v. Jacobson,* 172 F.3d at 166. However, plaintiffs bear the burden of showing that there is "good cause" for postponement. 18 U.S.C. § 3626(e)(3). The statute's inclusion of a "good cause" requirement shows that the postponement is not granted automatically.

■ No ultimate prejudice arises from a failure to postpone the automatic stay. The automatic stay does not terminate the consent judgment. It is of limited duration, and ends when the court "enters a final order ruling on the motion" to terminate the decree. Thus, failure to postpone the stay when good cause has not been demonstrated works no injury to plaintiffs.

Relieving the defendants from the enforcement of the Consent Judgment, even temporarily and *pendente lite,* is consistent with the purposes of the PLRA. The automatic stay advances and implements a central purpose of the PLRA, namely, that prospective injunctive relief must cease if it was made without the requisite need-narrowness-intrusiveness findings because the obligations imposed on the defendants are impermissible and not enforceable. *Miller v. French,* 530 U.S. at 346–348, 120 S.Ct. 2246.

The record before me does not demonstrate that there are widespread constitutional violations at OCCF. Accordingly, plaintiffs have not shown good cause for postponing what Congress intended would be an automatic stay.

Plaintiffs submit six affidavits in support of their application to postpone the automatic stay. Five are from inmates who complain of various personal grievances: failure to permit religious observances or

provide religiously-appropriate food; lack of medical attention; lack of access to the law library or to counsel by virtue of keeplock confinement; lack of proper clothing (generally shoes); excessive force; random strip searches; and inability to file grievances about the foregoing. Each inmate's affidavit details grievances peculiar to his situation. Many of the affiants' complaints do not rise to the level of constitutional violations. The affiants offer no evidence that any of their complaints are symptomatic of widespread problems in the jail. The sixth affidavit is from a psychiatrist, who opines that OCCF fails to give its inmates proper mental health care, based on, *inter alia,* his review of the files of four inmates who have brought a separate action *(Atkins v. County of Orange,* No. 01 Civ. 11536 (S.D.N.Y. filed Dec. 18, 2001)) challenging the adequacy of mental health care at OCCF.

The County submits an affidavit from Captain Joseph Ryan, the Accreditation Manager and Day Shift Commander at OCCF; Imam Abdul–Malik, the Muslim religious adviser at the facility; and Lieutenant Patrick Russnak, Grievance Coordinator at OCCF. These affidavits are accompanied by extensive documentation from OCCF records that rebuts or explains nearly every individualized complaint by the five affiants.

Additionally, I note that today's OCCF is not the same facility that was the subject of the 1978 injunction. Last year, Orange County opened a brand new correctional facility—modern and built to conform to twenty-first century penological requirements. Captain Ryan submits the recent report by the State Corrections Commission, the agency charged with oversight of OCCF in virtually every area covered by the consent judgment. The report—on which I place the greatest reliance—finds OCCF's new facility in Goshen to comport with every state correctional standard.

Under the PLRA, prospective relief (all relief other than money damages) under an old injunction directed to prison conditions must be terminated unless the court makes written findings based on the record that the relief is necessary to correct an ongoing or current violation of a federal right, and then only to the extent that the relief is narrowly drawn and is the least intrusive means to correct the violation. 18 U.S.C. § 3626(b)(3). Thus, I must analyze the evidence adduced by plaintiffs and defendants in support and in opposition to this application with an eye to whether it establishes ongoing or current violations of recognized federal rights.

With regard to the specific evidence submitted by plaintiffs, I conclude as follows:

■ *First,* there is no evidence that defendants have interfered with inmates' ability to exercise their religion. One of the three complaining inmates complains of the fact that OCCF does not provide Jumu'ah services on Fridays for its Muslim inmates. However, as the United States Supreme Court made clear in *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987), even though there is "no alternative means of attending Jumu'ah" where no such services are provided, no constitutional violation is committed as long as the Muslim inmates have alternative means of expressing their Muslim faith. *Id.* at 351–52, 107 S.Ct. 2400. OCCF cannot provide Jumu'ah services on Friday because it is necessary for an Imam to preside over Jumu'ah, and the only one in the area— Imam Abdul–Malik—is unavailable (because he is presiding over Jumu'ah at his mosque on Friday). OCCF provides its inmates with alternative worship opportunities that are virtually identical to those sanctioned by the Supreme Court in

*O'Lone.* They have organized worship with the Imam on Tuesdays and special additional religious activities for Ramadan. OCCF officials also permit inmates to say alternative prayers on Fridays from 1 to 2 p.m., the traditional hours for Jumu'ah. (Abdul–Malik Aff.).

Moreover, the decision to deny a Jumu'ah service in the absence of a qualified Imam rests on sound penological grounds. Imam Abdul–Malik explains that efforts by religiously unqualified inmates to lead Jumu'ah have in the past led to riots, especially if individuals use the group setting to express inflammatory or racist views. *Id.* Other courts have recognized that potential safety and security issues can arise during a prison religious service that takes place without a religious adviser present—security that would be jeopardized if inmates were given authority positions as "religious leaders" over other inmates. *Hadi v. Horn,* 830 F.2d 779, 784–85 (7th Cir.1987); *Al–Alamin v. Gramley,* 926 F.2d 680, 687 (7th Cir.1991).

I further find that inmates are not routinely denied kosher food when requested—even though Imam Abdul–Malik avers that it is not necessary for a Muslim to eat a kosher diet. Captain Ryan attests that OCCF policy is to provide any Muslim who requests kosher meals as a religious accommodation. The prison does not serve any meals with pork or pork by-products, which would be forbidden to Muslims. And the prison's grievance coordinator reports that no inmates have filed complaints about any inability to obtain kosher food rather than a regular diet. Prison records appended to Captain Ryan's affidavit demonstrate that Leon Quinn, the inmate who complained of not receiving kosher food, consistently purchases substantial quantities of non-kosher snack food at the jail's commissary. Thus, Quinn's claim of widespread failure to accommodate is not credible.

The two other affidavits protesting lack of religious accommodation, those of Demetrius Williams and Mark Pagan, are similarly flawed. Mr. Pagan's only complaint is that he is not allowed out of keeplock, where he is being punished for rules infractions, in order to attend religious services. He does not even identify his religious affiliation, and he offers no evidence to support a claim that OCCF fails to offer a program that accommodates his religious requirements. Mr. Pagan is allowed to attend Protestant services, weekly Bible study, and Promise Keeper meetings. He has no constitutional right to have a Pentecostal minister, as opposed to a minister of some other Protestant denomination, preside at religious services.

Thus, plaintiffs offer no credible evidence that OCCF fails to accommodate the affiants' religious needs, let alone that there is widespread disregard for the inmates' religious beliefs at the facility.

■ *Second,* I do not find that plaintiffs have demonstrated widespread disregard for the provision of constitutionally adequate medical care. In a case like this one, the Court's focus must be on whether the facility's medical program provides reasonable access to medical care—that is, whether the jail has systematic deficiencies in staffing, facilities, or procedures that make unnecessary suffering inevitable, *Todaro v. Ward,* 565 F.2d 48, 52 (2d Cir. 1977), or whether prison officials intentionally deny a prisoner access to medical care or interfere with prescribed treatments. *Bryant v. Maffucci,* 729 F.Supp. 319, 322–23 (S.D.N.Y.1990). Several affiants complain that they were denied medical care— one states that he was not allowed to take Tylenol according to his doctor's advice, another that he was forced to wear im-

properly fitted shoes, yet another disagreed with the eye treatment offered him and complained of not being given enough to eat. But none of them states facts that rise to the level of constitutionally deficient medical care. That is, the inmates do not allege a sufficiently serious deprivation that is a condition of urgency, one that may produce death, degeneration or extreme pain. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). The particular complaints voiced by the affiants amount to disagreements with medical decisions— and decisions that relate to relatively minor ailments, not conditions of urgency. They probably do not even rise to the level of negligence or medical malpractice, which are not constitutionally actionable. *Estelle v. Gamble,* 429 U.S. 97, 105–06, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

■ This is true of the mental health complaints as well. Per OCCF Policy (Ryan Aff., Ex. B), mental health personnel are available to prisons for thirteen hours each weekday and four hours on Saturdays. The prison provides a number of treatment groups as well as individual and group counseling. The County correctly characterizes Dr. Selig's affidavit when it observes that "[h]is opinion is nothing more than what one would expect to see from an expert in a medical malpractice action—that the mental health clinic and its personnel are guilty of malpractice." (Defendants' Brief at 18). Dr. Selig's observation that care was not consistently dispensed by the same person is a perfect example of something that is not constitutionally required—and, indeed, is a level of care to which many who are not incarcerated have no access. It appears that plaintiffs are arguing that OCCF is required to provide prisoners with the best possible mental health care. In fact, all that is required is reasonable mental health care.

The Supreme Court has observed that, "[s]ociety does not expect that prisoners will have unqualified access to health care." *Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). The State Corrections Commission Report concludes that OCCF's medical care is consistent with the State's minimum standards for penological institutions. (Ryan Aff., Ex. D). The PLRA forbids a federal court from requiring that OCCF officials exceed their authority under state law, unless state law violates federal law. 18 U.S.C. § 3626(a)(1)(B). Plaintiff here makes no showing that New York's minimum standards for prison medical care violate any federal law. And the particular complaints contained in the record before me do not rise to the level of deliberate indifference to medical needs and wantonness that would give rise to an Eighth Amendment violation.

*Third,* the allegations of excessive force used against two of the affiants (Statler and Pagan)—even assuming them to be true—have nothing to do with the Merriweather consent injunction, because the injunction does not address itself to terms and conditions concerning the use of excessive force. The same, by the way, is true of the allegations that two prisoners were subjected to random strip searches during their incarceration—a practice that is generally not constitutionally infirm, at least after an inmate has been admitted to the general population of a prison. *See Covino v. Patrissi,* 967 F.2d 73 (2d Cir.1992); *see also Shain v. Ellison,* 273 F.3d 56, 64 (2d Cir.2001). The inmates are of course free to pursue their personal grievances over such matters, but they must do so in an appropriate forum, not in this action. In any event, the claims do not demonstrate a widespread disregard for the con-

stitutional rights of inmates.[1]

■ *Fourth,* allegations that a prisoner (Statler) in keeplock was impaired in his ability to consult with counsel are not supported by the record. OCCF records demonstrate that Statler was in touch with his lawyer by telephone twice, met with his lawyer between one and three times, and went to the law library once during the period that he alleges he was in keeplock. (Ryan Aff. ¶ 15). Furthermore, allegations that a prisoner in keeplock cannot go to the law library are not constitutionally actionable. The United States Supreme Court has held that a correctional facility's decision to restrict "lockdown prisoners' access to law libraries" deserve substantial deference, "since the inmates in lockdown include 'the most dangerous and violent prisoners in the [ ] prison system,' and other inmates presenting special disciplinary and security concerns." *Lewis v. Casey,* 518 U.S. 343, 361, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). From the record before me, it appears that Stalter submitted requests for legal materials on three occasions during the same period and received materials in his cell on each occasion. This gave him an adequate alternative means of performing legal research.

*Fifth,* the other claims made by the inmate affiants, such as verbal harrassment or denial of access to inmate grievance procedures, do not rise to the level of constitutional deprivations.

■ *Sixth,* and most important, these five prisoners' complaints, without more, do not demonstrate any need for *system-wide* relief. If their rights were in fact violated, it was due to an infraction of the rules, not compliance with them. OCCF

has supplied me with jail policies that appear on their face to be constitutionally compliant and to preclude the sort of deprivations alleged by affiants. This means that any deprivation of these five inmates' constitutional rights occurred in spite of the policies, not because no policies exist. The proper remedy for such complaints is a Section 1983 action, not a system-wide injunction. That, of course, is a remedy left open by Congress when it passed the PLRA.

Of course, plaintiffs have presented me with an extremely limited record. They have not even begun to take discovery in this matter (a fact that is incomprehensible to me—but, then, it is incomprehensible that plaintiffs did not move to postpone the stay by order to show cause, or otherwise call the urgency of the application to my attention). Over the next month, they may develop a record that would support a continuation of some or all of the 1978 injunction, based this time on the findings mandated by the PLRA. We will litigate that question in due course. For now, I simply conclude that plaintiffs—who bear of the burden—have not demonstrated good cause for postponing the automatic stay.

## CONCLUSION

The automatic stay will remain in effect until there is a final order ruling on defendant's motion. The parties are referred to Magistrate Judge Fox, who will supervise discovery. The Court has set a hearing in this matter for March 7, 2003, at 10 a.m. Plaintiffs' further opposition to the motion shall be filed by February 21, 2003. De-

---

1. On the record before me, it is far from clear that the excessive force claims have merit. It appears that Pagan had to be physically restrained after he attacked a corrections officer and committed other violent behavior; and

Statler's behavior at or about the time of the alleged beating is inconsistent with his current allegation that corrections officers inflicted serious physical injury on him.

fendants' reply papers shall be filed by February 28, 2003.